AMERICAN CONST. CO. et al. v. KRAFT
et al. (No. 8560.)

(Court of Civil Appeals of Texas. Galveston.
July 2, 1924.)

1. Insurance ⬤⟩105—Agreement held not a
promise to pay commission for procuring con-
struction bond.

An agreement of a construction company
that insurance agency might, if it saw fit, write
a construction bond which the company had
previously contracted to obtain from such
agency for plaintiff's account and divide their
commission with plaintiff, held not an implied
promise to pay plaintiff a commission for ob-
taining the bond, or to make the company re-
sponsible for payment of such commission by
the insurance agency.

2. Contracts ⬤⟩19—Agreement or offer, lack-
ing consideration, may be withdrawn before
acted upon by other party.

An agreement or offer, which is without any
consideration, may be repudiated or withdrawn
any time before it is acted upon by the other
party.

3. Insurance ⬤⟩74—Offer held unilateral and
subject to withdrawal before performance.

Where, in return for defendant insurance
agency's offer to write construction bond for
account of plaintiff insurance agency, if latter
would obtain order for bond from construction
company, plaintiff gave nothing and did not
agree to obtain the order, such offer was with-
out consideration and unilateral, and could be
withdrawn before performance or part per-
formance by plaintiff.

4. Insurance ⬤⟩84(5)—Contract to procure
order from another for execution of indemni-
ty insurance bond held void.

Where appellees were not agents of a sure-
ty company and had no certificate of authority
to represent it, their agreement with defend-
ant agency, to procure an order from a con-
struction company directing defendant to pro-
cure an indemnity insurance bond with the
surety company, held void in view of Rev. St.
art. 4960, and Pen. Code 1911, art. 689.

Error from Harris County Court; Roy F.
Campbell, Judge.

Action by W. O. Kraft and others against
the American Construction Company and oth-
ers. Judgment for plaintiffs, and defend-
ants bring error. Reversed and rendered.

Vinson, Elkins, Wood & Sweeton, of Hous-
ton, for plaintiffs in error.

Jones, Roberts & Monteith and D. A. Sim-
mons, all of Houston, for defendants in er-
ror.

PLEASANTS, C. J. Defendants in error,
hereinafter styled appellees, brought this
suit against plaintiffs in error, hereinafter
styled appellants. Appellees sue as a part-
nership composed of W. O. Kraft, Gerome B.

Cochran, and H. L. Houseman, doing busi-
ness under the firm name and style of Coch-
ran's Insurance Agency. The defendant the
American Construction Company is a cor-
poration organized under the laws of this
state; the other defendants are John L.
Wortham, Gus S. Wortham, and B. F. Car-
ruth, a partnership conducting an insur-
ance agency business under the firm name
and style of John L. Wortham & Sons. The
purpose of the suit is to recover a brokerage
commission of $655.80 alleged to be due ap-
pellees by appellants on the amount of a
construction bond for the construction by ap-
pellant corporation of a hospital building for
the Hermann Hospital Estate.

The following sufficient statement of the
pleadings on which the case was tried is
copied from appellants' brief:

"Plaintiffs' petition alleged: (1) That on
March 1, 1923, they were conducting a general
insurance agency in the city of Houston and
were duly .licensed as such by the laws of the
state; (2) that the defendant John L. Wortham
& Son agreed to pay plaintiffs a brokerage com-
mission on a certain construction bond if plain-
tiffs would procure an order from the American
Construction Company for said bond and the
same was written through defendants John L.
Wortham & Son in the National Surety Com-
pany; (3) that such order was procured from
the American Construction Company for said
bond in the sum of $655,800 through John L.
Wortham and in the National Surety Company,
and that the brokerage commission on said
bond was the sum of $655.80; (4) that there
was a general custom in the insurance business
for agents to brokerage their business, and in
which event the agents who procured the busi-
ness were entitled to the brokerage commis-
sion; (5) that the defendant American Con-
struction Company agreed to pay plaintiffs the
premium on said bond in consideration that
plaintiffs procure said bond direct from the
National Surety Company or through John L.
Wortham & Son, and in case it was procured
through John L. Wortham & Son, plaintiffs
would be paid only a brokerage commission;
that the defendants refused on demand to pay
said brokerage commission.

"The defendants' answer consisted of gen-
eral demurrer, special exception, general de-
nial, and special pleas in bar. Their defenses
to the merits were: (1) That there was no
consideration to support the contract declared
on by plaintiffs for the reason that the defend-
ant American Construction Company, at the
time of the alleged agreement with plaintiffs
made the basis of this cause of action, was
bound and obligated to make the said construc-
tion bond in the National Surety ' Company
through John L. Wortham & Son; and that the
defendants John L. Wortham & Son, at the
time of the alleged contract with plaintiffs,
were under a contract with the American Con-
struction Company which entitled the defend-
ants John L. Wortham & Son to the entire
commission on the said bond; (2) that the
plaintiffs were not the duly licensed agents of
the National Surety Company at the time of
the alleged contracts, and therefore the said

contracts were in violation of the laws of this state and void."

The cause was submitted to a jury in the court below on the following special issues:

"Special issue No. 1. Was there, or not, a general custom in the insurance trade in the months of January, February, and March, 1923, whereby one insurance agent was entitled to a brokerage commission on business delivered by him to another agent and written by such other agent in such other agent's company? You will answer, 'There was' or 'There was not,' as you find the facts to be.

"Special issue No. 2: Did, or did not, B. F. Carruth, as a member of the firm of John L. Wortham & Son, agree to pay the Cochran Insurance Agency the brokerage commission on the construction bond if W. O. Kraft of said Cochran Insurance Agency would procure an order from the American Construction Company requesting that the construction bond be made through the Cochran Insurance Agency? You will answer, 'He did' or 'He did not,' as you find the facts to be.

"Special issue No. 3: Did, or did not, the defendant American Construction Company agree to make the construction bond through the Cochran Insurance Agency? You will answer, 'It did' or 'It did not,' as you find the facts to be.

"Special issue No. 4: If in answer to special issue No. 3 you find that the American Construction Company did agree to make the construction bond through the Cochran Insurance Agency, and only in that event, you will answer this question: Was there any consideration for that agreement? You will answer, 'There was' or 'There was not,' as you find the facts to be.

"Special issue No. 5: Did the plaintiffs and the defendants John L. Wortham & Son agree to execute the final contract bond in the National Surety Company through plaintiffs and pay them a broker's commission? Answer, 'They did' or 'They did not,' as you find the facts to be."

In response to these questions the jury answered:

No. 1, "There was." No. 2, "He did." No. 3, "He did." No. 4, "There was." And No. 5, "They did not."

Upon this verdict the trial court, on motion of plaintiffs, rendered judgment in their favor against both defendants for the sum of $655.80.

The undisputed evidence shows that the appellant American Construction Company was the successful bidder and was awarded the contract for the construction of a hospital building for the Hermann Hospital Estate at a contract price of $655,800. The terms under which bids were solicited by the Hermann Hospital Estate contained the following "instructions to bidders":

"The contractor or contractors will be required to furnish bond for 50% of the contract price, covering the faithful performance of the contract and the payment of all obligations arising therein.

"This bond shall be furnished by a surety company or companies approved by the owners and contractor shall submit with his proposal such surety companies as he proposes to be bonded by should he be awarded the contract."

These terms also required each bidder to submit with his bid a proposal or bid bond obligating the bidder, in event his bid was accepted, to execute a contract for the construction of the building in accordance with the terms of his bid.

When the American Construction Company submitted its bid, it was accompanied by a proposal or bid bond executed by the National Surety Company through appellant John L. Wortham & Son, its state agents. The instrument submitting the bid contained the following stipulations:

"In the event we are awarded this contract we agree to sign a mutually satisfactory contract and execute a satisfactory surety bond guaranteeing the performance of the contract signed.

"We inclose with our bid, bidder's bond of the National Surety Company, and in the event we are awarded contract we will make bond in this company."

In its application to John L. Wortham & Son for the proposal or bid bond, the construction company agreed, as part consideration for the execution of such bond:

"That the company (National Surety Company) shall execute the final or contract bond, if required, should the undersigned (American Construction Company) be awarded the contract, unless the company declines so to do, which right the undersigned specifically grants to the company."

Appellee Kraft testified as follows:

"In regard to my securing an order for a bond on the Hermann Hospital, * * * Mr. W. A. Childress, manager and one of the trustees of the estate, called me to his office one day and stated that the contract for the erection of the hospital for the Hermann Estate had been awarded to the American Construction Company, and that the estate would require a contractor's bond, and for me to arrange to make it. He told me that the American Construction Company preferred the National Surety Company, and I called on Mr. Houx, president of the American Construction Company, and told him that Mr. Childress asked me to see him and get an order to place the policy through John L. Wortham & Son, in the National Surety Company, but prior to that time I had seen Carruth, who was a member of the firm of Wortham & Son, and told him Mr. Childress had asked me to arrange for this bond, and asked him whether they would write it for our account, and Carruth said they would prefer that I procure a written order from the American Construction Company, and some time after that, when the bond was ready to be made, I called on Mr. Houx and got an order for the bond and delivered it to Gus Wortham of John L. Wortham & Son. * * *

"I got a written order from Mr. Houx for the bond. The order shown to me by counsel is

the order I procured from him. That is his signature to the order; I saw him file it."

The following is a copy of the order referred to.

"Houston, Tex., March 1, 1923.

"John L. Wortham & Son, General Agents, National Surety Company, Houston, Texas—Gentlemen: At the request of Mr. Childress of the Hermann Hospital Board, we are handing you herewith bond covering the construction of the main building of the Hermann Hospital, through the Cochran's Insurance Agency. Please execute same immediately.

"Yours truly,　　　S. B. Houx, President."

"I obtained the bond at the same time I obtained the order for the bond. When I obtained the order for the bond, I took it and a blank bond. and delivered it to Gus Wortham. * * *

"We did not make the bond in our company because Mr. Houx preferred the National Surety Company, and if Mr. Carruth had not stated that he would have issued the bond, I would have endeavored to place it in our company. * * *

"Mr. Gus Wortham was the one who stated that if he executed the bond it would be on a direct basis, but Mr. Carruth had stated that if I brought in a written order, he would issue it for our account. * * *

"I had two conversations on the same day with Mr. Wortham. There was one had prior to the conversation when he said he would not execute the bond for our account. I first brought the bond, and he would not execute it; I told him Carruth said he would execute it on a written order, and I went and got it and delivered it to Mr. Wortham. * * *

"Some 30 days before that Mr. Carruth had told me that if I got a written order from Mr. Houx that John L. Wortham & Son would write the bond for our account. Mr. Carruth is a member of the firm of John L. Wortham & Son, and I absolutely relied upon his statement that they would execute the bond for us. I complied with what Mr. Carruth stated would be necessary in order for them to write the bond and produced a written order. * * *

"At the time of my first conversation with Mr. Gus Wortham, he stated that he had made a bid bond. I knew that the bid bond provided that the National Surety Company should execute the final bond. Mr. Gus Wortham did not state to me at that time that they were going to execute the final contract bond. He said he had made the bid bond, and I said that was satisfactory to us in making the permanent bond, and I said that we had an order on the Hermann Hospital Estate, or an order from Mr. Houx to write it.

"At the time I went to see Mr. Wortham and had the bond with me, he said he would not execute the bond for our account. He said he had already made the bid bond. As I recall, that is the only reason he gave for not executing the bond for our account."

Gus S. Wortham, who acted for his firm in executing the bid bond and the final construction bond on which appellees claim a brokerage commission, testified:

"In connection with the execution of the final bond, Mr. Kraft came to my office along about 2:30 or 3 o'clock one afternoon, as I recall, in the early part of March, and said he wanted to get us to execute a construction bond for the American Construction Company covering the erection of the Hermann Hospital for the Hermann Hospital Estate, and I said to Mr. Kraft, 'We already have a contract for this bond, and we cannot execute it for your account.' I further stated that we were in a position to control the business, and I stated that 'we cannot handle it for you on account of our contract.' 'In addition to that you are not an agent for the National Surety Company, and it would be a violation of the law for us to allow you a commission on the bond.' He then said, 'Well, I can get the bond executed by the United States Fidelity & Guaranty Company of Hartford.' I said: 'The business is yours; execute it wherever you please; if the business belongs to you it is no concern of mine.' And he said, 'All right, I will do it,' and he picked up the contract and left my office. This was the first conversation that took place. Some 30 minutes later he came back to my office and said, 'I want you to execute this bond for us,' and I said, 'I have already told you I would not execute the bond for you,' but he said, 'I have a written order from the American Construction Company to you to execute the bond.' I said: 'I don't care whether you have an order or not; we will stand by our contract with the American Construction Company.' And he said, 'here is the letter.' I read the letter from Mr. Houx, and I then said, 'I will have to again refuse to make the bond.' Some other conversation took place along this same line, and about that time Mr. Houx came in and said: 'What is all this delay about the bond. I have to file my bond and I want to get over there and get the matter closed.' And I said: 'Mr. Houx we cannot execute it for the Cochran Agency; we already have a contract from you for this bond signed some time ago, and we will have to hold you on this contract.' And he said, 'If you won't execute it for the Cochran Agency, will you execute it for me?' and I said, 'Yes, on a direct basis,' and he said, 'All right, execute it,' and I said, 'I will do it right now and will bring it to you in a few minutes.' I executed this bond and delivered it to Mr. Houx."

S. B. Houx, a witness for appellants, testified in part as follows:

"After the contract for the Hermann Hospital was awarded to the American Construction Company the early part of January—I think about the 8th—I went down to the office of the Hermann Hospital Association, and the trustees, and I met Mr. Childress for the first time. Mr. Childress is, I think, a trustee, and is business manager of the estate. A few days later Mr. Cochran and Mr. Kraft called at my office; that was the first time I had ever met Mr. Kraft—I knew Mr. Cochran—and they requested that we give them the commission to execute the final bond on the Hermann Hospital. I told them that I had already made arrangements with the National Surety Company, through Mr. Wortham's agency, to make this bond, and to which Mr. Kraft then said, 'Did Col. Childress speak to you about me?' and I said he had, and that I thought this matter had been

provided for, and I said, however, if the Wortham agency and the National Surety Company want to split their commission with you, that is none of my affair; that was all that was said at that time. * * *

"In giving this order that Capt. Childress wrote and I signed, there was nothing said by Mr. Kraft, or any member of the Cochran's Insurance Agency, in reference to our paying them any commission; the only thing ever said was, I made the remark that if the Worthams wanted to split their commissions it was none of my affair. I told him that before the bond was executed."

Appellee Kraft further testified:

"In the conversation between Mr. Wortham, Mr. Houx, and myself, Mr. Houx stated that he wasn't interested in the question of commission; that he wanted the bond, and that Wortham and myself could thrash that out later. Mr. Houx did not ask Wortham if he would write the bond for him; he simply told Mr. Wortham that he wanted the bond, and wanted it immediately."

The evidence in regard to the general custom for the payment of brokerage commission in the insurance business in the city of Houston during the months of January, February, and March, 1923, shows that if an insurance agent was applied to for insurance in a company he did not represent or of a character which he was not authorized to sell, and turned such business over to an agent authorized to write the desired insurance, under the general custom prevailing in Houston at that time he was entitled to receive as brokerage commission a percentage of the premium received by the agent writing the policy of insurance. If appellees are entitled to compensation under this custom, the brokerage commission would amount to the sum of $655.80.

After the introduction of the evidence had been concluded, the defendants requested the court to instruct the jury to return a verdict in their favor.

We think the evidence fails to show any liability on the part of either of appellants for the brokerage commission claimed by appellees, and appellants' assignments complaining of the refusal of the court to instruct a verdict in their favor must be sustained.

[1.] There is no conflict in the testimony upon any material issue. In so far as the appellant construction company is concerned, there is not a scintilla of evidence that it expressly or impliedly employed appellees to act for it in obtaining the bond from John L. Wortham & Son. All that it did was to agree with appellees that John L. Wortham & Son might, if they saw fit, write the insurance which the construction company had already contracted to obtain from them for appellees' account and divide their commission with appellees. That this was the extent of the construction company's agreement

with appellees is shown by the uncontradicted testimony before set out. This agreement cannot be tortured into an implied promise by the construction company to pay appellee the commission claimed in this suit or to in any way become liable for the payment of such commission by John L. Wortham & Son.

[2] It is, we think, equally clear that the evidence fails to show any completed or enforceable contract by John L. Wortham & Son to pay appellees the brokerage commission claimed by them. Appellees' claim that Wortham & Son were obligated to pay them a commission is based upon the testimony of appellee Kraft that after Mr. Childress had volunteered to suggest to him that he might get a commission from Wortham & Son by looking after the execution of the final contract bond he saw "Carruth, who is a member of the firm of Wortham & Son, and told him that Mr. Childress had asked me to arrange for this bond and asked him whether they would write it for my account, and Carruth said they would prefer that I produce a written order from the American Construction Company," and the further fact that 30 days or more after this conversation with Carruth, and after he had been told positively by Mr. Gus Wortham that his firm would not write the insurance for appellees' account, he procured an order from the construction company for the execution of the bond.

[3] If the statement of Carruth as testified to by Kraft can be construed as an implied agreement to pay appellees the customary brokerage commission if they obtained an order for the execution of the bond, such agreement never became a binding and enforceable contract. At most, it was nothing more than an offer on the part of Wortham & Son to write the insurance for appellees' account if appellees would obtain the order for the bond. Appellees gave nothing for this offer or option, and did not promise or agree to obtain the order. Such contract being without consideration and purely unilateral, it could not become binding until there had been performance or part performance by appellees, and until such time the appellants Wortham & Son had the right to withdraw the offer.

The undisputed evidence shows that before the order was obtained or any effort made by appellees to obtain it, the offer or agreement of appellants Wortham & Son to write the insurance for appellees' account was withdrawn.

The general principle of law that an agreement or offer made without any consideration being paid or given therefor may be repudiated or withdrawn at any time before it is acted upon by the other party is too well settled to require citation of authority. The rule as to unilateral contracts of this kind is thus stated by the Court of Civil

Appeals for the Sixth District in the case of Johnson v. Breckenridge, 241 S. W. 195, in discussing a contract by which plaintiffs agreed to permit defendants to use abstracts owned by plaintiffs if defendants would pay a certain percentage of the fees charged by them for each abstract:

"It is a general principle of law that if a contract is incapable, in the want of mutuality, of being enforced against one party, that party is equally incapable of enforcing it specifically against the other. Therefore if it appears, as it does, from the terms of the agreement under consideration, that the 'right' or permission 'to use' or have casual access to the indexes and records could be declined or terminated in the inception or first instance at the will of appellants without liability for damages, it must follow that its continuance was dependent upon the pleasure of both parties. * * *

"We conclude that the contract itself here in controversy is indefinite and unilateral, and therefore determinable, as the court below held, at the will of either party. Grocery Co. v. Jamison (Tex. Civ. App.) 221 S. W. 998; Film Co. v. Morris & Daniel (Tex. Civ. App.) 184 S. W. 1060; Goff v. Saxon, 174 Ky. 330, 192 S. W. 25; Cold Blast Co. v. Bolt & Nut Co., 114 Fed. 77, 52 C. C. A. 25, 57 L. R. A. 696."

[4] If this conversation between Kraft and Carruth could be construed as a binding contract or agreement, by which Kraft undertook to procure an order from the construction company for the execution of an indemnity insurance bond by the National Surety Company, such contract would be unenforceable and void because in direct violation of the statute of this state.

Article 4960 of the Revised Statutes of the State of Texas provides:

"It shall not be lawful for any person to act within this state, as agent or otherwise, in soliciting or receiving applications for insurance of any kind whatever, or in any manner to aid in the transaction of the business of any insurance company incorporated in this state or out of it, without first procuring a certificate of authority from the commissioner of agriculture, insurance, statistics and history (commissioner of insurance and banking)." Acts May, 1874; P. D. 7116g.

And article 689 of the Penal Code provides:

"Any person who, for direct or indirect compensation, solicits insurance, in behalf of any company, or transmits for a person other than himself, an application for a policy of insurance to or from such company, or assumes to act in negotiation of insurance without a certificate of authority to act as agent or solicitor for such company, or after such certificate of authority shall have been cancelled or revoked, shall be guilty of a misdemeanor, and, upon conviction, shall be punished by a fine of not less than one hundred dollars." Id. p. 208.

The appellees were not agents for the National Surety Company, and had no certificate of authority from the state insurance commission to represent that company, and we think, under the plain provisions of these statutes, they are prohibited from doing the things for the doing of which they are claiming compensation in this suit.

From the conclusions before stated it follows that the judgment of the trial court should be reversed and judgment here rendered for appellants, and it has been so ordered.

Reversed and rendered.