SOUTHWEST TITLE INSURANCE COMPANY, Petitioner,

v.

NORTHLAND BUILDING CORPORATION et al., Respondents.

No. B–6390.

Supreme Court of Texas.

June 8, 1977.

Rehearing Denied June 29, 1977.

Elmer H. Parish, Gene Richie, Wichita Falls, for petitioner.

Nelson, Montgomery & Robertson, David L. Tate, Wichita Falls, Keck & Barnes, Douglas A. Barnes, Dallas, Byron H. Schaff, Plano, for respondents.

REAVLEY, Justice.

This suit seeks either recovery under a mortgagee's title insurance policy or recovery because of the violation of a condition to the closing and disbursement of the mortgagee's funds. The trial court and Court of Civil Appeals have rendered judgment for the mortgagee. 542 S.W.2d 436. We hold that the mortgagee has shown a breach of the terms of the title insurance policy, but we sever and remand that claim because of the lack of proof of damages.

The problem emanated from a $55,000 loan made by Northland Building Corporation to Dal-Rich Investments, Inc. on Octo-

ber 15, 1971. Northland was a family investment corporation in Wichita Falls and Dal-Rich was an automobile agency in Richardson in need of money. By a letter dated October 5 from Northland to Dal-Rich and accepted by it, the terms and conditions of the loan were agreed to. Second or third liens upon several lots in the North Richardson Addition were to be security for the repayment of the loan, and Dal-Rich was to furnish written statements from the owners of prior liens specifying the current balances of their indebtedness and agreeing that, regardless of any contrary provisions in their own agreements, their liens were superior to the lien to be granted Northland only to the extent of those current balances plus interest and proper fees. Dal-Rich was to furnish Northland with either a written title search report covering the properties or a mortgagee title insurance policy.

Jeffrey Grynwald, an attorney in the private practice of law in Plano, had represented Dal-Rich on previous matters, and was brought into the matter by Dal-Rich to satisfy these requirements of Northland's commitment letter. Grynwald was also an approved attorney of Southwest Title Insurance Company. Among the documents to be obtained for closing were two letters from Citizens State Bank of Richardson relative to its $18,900 loan to Dal-Rich made on February 4, 1971 and its $175,685 loan made on February 17, 1971. The former was secured by a deed of trust on Lot 6 in Block 2 of the North Richardson Addition, and the latter was secured by a deed of trust on Lots 7 through 10 of the same block and addition. These "estoppel letters" were to limit the priority of Citizens State Bank to the Northland security position in these lots to the extent of the current balance owing thereon. Grynwald gave the letter forms to Dal-Rich, and completed letters were returned to Grynwald which appeared to be signed by the President of Citizens State Bank. It later developed that these signatures were forged and that the President of Citizens State Bank had refused to relinquish any right in the security position to which the bank was entitled.

Northland made its $55,000 check payable to the order of Southwest Title Insurance Company and enclosed that check with a letter addressed to "Southwest Title Insurance Company c/o Guaranty Abstract & Title Company, 816 7th Street, Wichita Falls, Texas," advising that the loan was "to be closed by your agent, Jeffrey Grynwald, of Plano, Texas," and stating that "such funds should be disbursed for such loan whenever you have satisfied yourself that all requirements of Northland's commitment letter dated October 5, 1971 . . have been met . . . ." Guarantee Abstract & Title Company, the title insurance agent of Southwest Title in Wichita County, forwarded the letter to Grynwald, who endorsed the check "Southwest Title Insurance Company by Jeffrey Grynwald," and deposited the funds in his trust account at the First National Bank of Plano. On October 15 the transaction was closed and Grynwald disbursed the funds according to plan, and the documents were forwarded to Northland. Grynwald withheld $282 as premium for the title insurance policy. He paid 40% of this premium to Southwest Land Title Company, which was the title insurance agent of Southwest Title in Dallas County and which had furnished him the title information on the property; and after retaining 40% of the premium for himself, he forwarded 20% ($56.40) to Southwest Title Insurance Company. The title policy was executed by Southwest Title and forwarded to Northland.

Dal-Rich defaulted after making seven monthly payments on the note, and then Northland learned for the first time that the estoppel letters had been forged and that the amounts owing to Citizens State Bank totaled considerably more than the original loans and the amounts stated in the estoppel letters. The deeds of trust securing the loans by Citizens State Bank contained dragnet clauses which provided that the payment of any loan subsequently made would also be thereby secured. Additional loans had been made by Citizens to Dal-Rich following the date of the loan from Northland to Dal-Rich; the result was that

when Citizens foreclosed on the lots in Block 2 on August 1, 1972, the proceeds all went to Citizens and nothing was left for Northland. Dal-Rich is insolvent.

Northland brought this suit against Southwest Title, Grynwald and First National Bank of Plano. The trial was to a jury which found, in part, that Grynwald was acting as agent of Southwest Title in attempting to follow the instructions in the final closing letter from Northland, that Grynwald was also acting as apparent agent of Southwest Title and that Southwest Title ratified the endorsement of Grynwald on the check payable to the order of Southwest Title (by accepting the benefits of the real estate transaction). The trial court rendered judgment for Northland against Southwest Title for $45,801.14 plus 18% interest thereon from August 1, 1972 until the date of the judgment on August 1, 1975. The Court of Civil Appeals affirmed, holding that Southwest Title was liable to Northland to this extent because of the coverage of the title policy and, as well, because of Grynwald's violation of the condition that valid estoppel letters be obtained prior to the release of the loan funds to Dal-Rich.

## AGENCY OF GRYNWALD

It may be assumed for present purposes that the agreement or conditions imposed by Northland upon the disbursement of its funds to Dal-Rich required that Grynwald or his principal, if any, guarantee the authenticity of the estoppel letters. This record contains no evidence that Southwest Title authorized Grynwald to make that guarantee on its behalf. Southwest Title had certified Grynwald to be an "approved examining attorney," which meant simply that his opinion on land titles would be accepted.

Under the Insurance Code of Texas only the operators or owners of abstract plants may be title insurance agents, and they in turn may employ their own escrow agents to disburse escrow funds. Art. 9.02(f) and (g). These title insurance agents and escrow agents must be licensed by the State Board of Insurance. Arts. 9.35 et seq. and arts. 9.41 et seq. The agency of the "title insurance agent" is for the solicitation and issuance of title insurance. Art. 9.02(f). Grynwald's relation to Southwest Title and its title insurance agents was limited to their willingness to accept his legal opinion on land titles.

It may be further assumed that Grynwald had the authority "to close" the assurance of the issuance of the title insurance policy. No question about that matter arises, because the title policy has been issued and Southwest Title stands behind the terms of the policy. The arguments in the case confuse the closing of a title insurance contract and the closing of the entire transaction between Northland and Dal-Rich which required the satisfaction of numerous conditions—including the acquisition of estoppel letters from Citizens State Bank. There is no evidence in this record that Southwest Title conducts any business other than the issuance of title insurance or that it authorized Grynwald or anyone to conduct and accept responsibility for the details and conditions of loan transactions.

There is no evidence of apparent authority of Grynwald to do more. His possession of blank title policy forms could bear only upon the authority to issue the title policy. If his endorsement of the check made payable to Southwest Title, and his conducting the closing in response to Northland's letter addressed to Southwest Title, can be said to have given appearance of wider authority, none of this was known or traceable to Southwest Title. Only the conduct of the *principal*, leading one to suppose that the agent has the authority he purports to exercise, may charge the principal through the apparent authority of an agent. *Chastain v. Cooper & Reed*, 152 Tex. 322, 257 S.W.2d 422 (1953). Nor can it be held that Southwest Title has ratified a wider exercise of authority on its behalf. The only benefit Southwest Title has received is the insurance premium, and Northland has at all times affirmed that portion of the transaction and insisted upon the performance by Southwest Title of the terms of the insurance contract.

## THE TITLE INSURANCE POLICY

The mortgagee's policy of title insurance issued by Southwest Title provided that it would pay to Northland " . . . all loss or damage not exceeding the amount stated in Schedule A which the Insured . . . may sustain or suffer by reason of failure of, defects in, encumbrances upon, or liens or charges against the title of mortgagors or grantors at or prior to the date of this policy, including mechanics' and materialmen's liens now having priority, or now existing but incomplete, which may hereafter be completed so as to gain priority over the lien of the Insured, . . . , and not excepted to in Schedule B hereof . . "

Schedule B provided, in part:

This policy is subject to the conditions and stipulations hereof, the terms and conditions of the leases and easements, if any, shown in Schedule A, and to the following matters which are additional exceptions from the coverage of this policy:

Following that language, two of the eighteen exceptions are in the following language:

8. Vendor's lien retained in deed from John Tingle, Wyndal H. Tingle and Gary L. Lawhorn, Trustees of Tingle Construction Company Employees Profit Sharing Plan, to Bob Kirsten, dated 2/24/71, filed 3/3/71, recorded in Volume 71043, page 206, Dr DCT, securing a note for $18,900.00 payable to Citizens State Bank further secured by a deed of trust to Charles R. Cravens, Jr., Trustee, filed 3/3/71, recorded in Volume 71043, page 0940, DTR, DCT (Page 86 at A–51125), Lot 6, Block 2;

15. Deed of Trust executed by Bob Kirsten to Charles R. Cravens, Jr., Trustee, dated 2/17/71, recorded in Volume 71036, page 1243, DTR, DCT, securing a note for $175,685.00, payable to Citizens State Bank, Lots 7, 8, 9 and 10, Block 2.

The question is whether the subsequent indebtednesses, exceeding the amounts of the original notes recited by these exceptions and which are secured by the liens because of the dragnet clauses in the deeds of trust, are excepted from the coverage of the policy by virtue of the above quoted language. Southwest Title argues that Northland knew of the dragnet clauses and that this was the purpose of its requiring the estoppel letters. We do not regard actual knowledge, or the notice to which the insured could be put by the reference in the policy to the deeds of trust, as relevant to the controlling question of what Southwest insured by the words of the policy.

Southwest Title contends that the provisions of the deeds of trust, including the dragnet clauses, are excepted from its coverage by the recitation to them and their place of record—thus incorporating by reference all of those provisions within the policy exceptions. There is no question but that a title insurance company may provide for an exception from its coverage by reference to the provisions of an instrument without setting forth in detail the content of those provisions. Again, the question is the effect of the particular language of this policy. When the language of these exceptions is studied, it will be seen that there is no statement to the effect that the coverage of the policy is subject to these certain deeds of trust and to whatever indebtedness may be thereby secured. Instead, the exceptions specify the indebtedness, to-wit certain notes, secured by the liens. Since the exception was limited to the prior liens securing *that* indebtedness, there was no exception for a prior lien securing additional future indebtedness to Citizens State Bank. Northland has proved that there was a defect in its security interest against which Southwest Title insured.

## DAMAGES RECOVERABLE UNDER THE TITLE POLICY

Northland's proof of damages was as follows: there was $45,801.14 owing on the Dal-Rich note as of August 1, 1972; the price paid upon the foreclosure of the Citizens State Bank lien and deed of trust on

August 1, 1972 was $250,874.12; all of that purchase money paid at the foreclosure sale went to Citizens State Bank because of its secured debt at that time of $253,416.70. The trial court rendered judgment against Southwest Title for $45,801.14 with 18% per annum interest from August 1, 1972 until the date of the judgment on August 1, 1975. That means that the amount of the judgment was $75,252.73.

Southwest Title committed itself under the terms of the policy to reimburse Northland for any loss suffered due to an impairment of its security title not listed as an exception in the policy. Northland could have sued for the difference in the market value of the insured equity less the market value of the actual equity securing the mortgage—the difference being the effect upon the market value of the security title due to the undisclosed lien or secured indebtedness. See *Goode v. Federal Title and Ins. Corp.*, 162 So.2d 269 (Fla.App.1964); *In Re Gordon*, 317 Pa. 161, 176 A. 494 (1935); Anno: Measure, Extent, or Amount of Recovery on Policy of Title Insurance, 60 A.L. R.2d 972 (1958). Northland is not restricted to that measure of damages, for it may recover its actual loss as subsequent events prove. And it is entitled to the interest provided in the note secured by its mortgage up to the date of the trial court judgment. *Fidelity Union Casualty Co. v. Wilkinson*, 94 S.W.2d 763 (Tex.Civ.App.1936) aff'd 131 Tex. 302, 114 S.W.2d 530 (1938). But in no event is the insured entitled to recover in excess of its unpaid indebtedness, or the market value of the land or equity insured, or the policy amount. Furthermore, the payment of the note is not insured. The insurer underwrites only against loss due to a defect in the security. Northland's position seems to be that proof of a defect in the security makes Southwest Title an insurer of the payment of Dal-Rich's note. When Southwest Title urges that Northland has failed to prove that its security was not otherwise adequate, Northland counters that Southwest Title cannot raise the point because it did not plead payment as required by Rules 94 and 95 of Texas Rules of Civil Procedure.

Northland is incorrect; its suit is upon the title policy and not upon Dal-Rich's note.

The judgment in favor of Northland is erroneous in two respects. In the first place, a suit upon the policy may not obtain judgment in excess of the policy amount— in this case $55,000. Secondly, Northland has failed to prove its loss due to the undisclosed secured indebtedness. It did prove that it obtained no funds from the foreclosure on Lots 6, 7, 8, 9 and 10 in Block 2. It did not prove the circumstances of the foreclosure, if any, on Lot 1, in Block 3 and Lots 7, 8, 9 and 10 in Block 5, all of which were covered by its deed of trust. These lots in Blocks 3 and 5 were appraised by Northland's witness at an amount which is $47,-285 in excess of the original note amounts reflected in the deed of trust. Until further proof has been made, its loss because of the undisclosed defect in its security interest has not been established.

The claim by Northland Building Corporation against Southwest Title Insurance Company on the title insurance policy is severed from the remainder of the cause, and the judgments below are reversed as to this severed claim; the severed cause is remanded to the trial court for further proceedings in accordance with this opinion. The judgments below as to the remainder of the cause are affirmed.