INSURANCE COMPANY OF NORTH
AMERICA and Waite Hill Services,
Inc., Petitioners,

v.

John W. MORRIS, et al., Respondents.

No. 96–1039.

Supreme Court of Texas.

Argued Jan. 6, 1998.

Decided July 14, 1998.

David C. Mattka, Mark M. Donheiser, Dallas, for petitioners.

Andrew R. Harvin, James E. Doyle, Stephen H. Lee, Houston, for respondents.

GONZALEZ, Justice delivered the opinion of the Court, in which PHILLIPS, Chief Justice, ENOCH, SPECTOR, BAKER, ABBOTT and HANKINSON, Justices, joined.

This surety bond case involves issues of agency, fraud, conspiracy, state securities act violations, DTPA, and duty of good faith and fair dealing. An insurance company issued bonds to guarantee some investors' loan commitments made in connection with leveraged purchases of limited partnership interests in oil and gas partnership programs. The investors defaulted, and the insurance company honored its bonds by making payment on the notes and then demanded reimbursement from the investors pursuant to indemnification agreements. The investors counterclaimed alleging various theories of liability. At trial, the jury answers were favorable to the investors. The jury found that the investors were not liable on the promissory notes or indemnity agreements they had executed, and the trial court declared the notes, bonds, and indemnification agreements to be unenforceable. The trial court rendered a money judgment for the investors under the DTPA and for attorneys fees. The court of appeals affirmed. 928 S.W.2d 133. The principal issue is whether the surety is liable to the investors for misrepresentations the general partner's broker-dealers made to induce

their investment. We conclude that there is no evidence that the broker-dealers had actual or apparent authority to charge the surety with their misrepresentations concerning the risks and profitability potential of the oil and gas partnerships. For this reason and those explained in this opinion, we affirm in part and reverse in part the judgment of the court of appeals, and render judgment that all parties take nothing.

## BACKGROUND

In the early 1980s, Commonwealth Enterprises, Inc., a Tennessee corporation, engaged in the business of structuring and syndicating interests in limited partnerships formed for the exploration, drilling, development, and production of oil and gas. Structuring these partnership interests as leveraged investments made them appealing to some investors. For an initial down payment, an investor could expect substantial federal tax deductions available for oil and gas development costs. Moreover, if the partnerships were profitable, the investors were hopeful that the oil and gas production revenues would be sufficient to pay the investor's promissory note installments as they came due.

This case concerns two of these limited partnerships, Overlord III and Overlord IV. Each limited partnership unit cost $20,000, comprising a $5,000 down payment and a $15,000 promissory note. Commonwealth assigned the limited partners' promissory notes to lenders in exchange for production loans. To make the promissory notes attractive to the lenders from which it sought the production loans, Commonwealth obtained Insurance Company of North America's ("INA") commitment to issue surety bonds guaranteeing the limited partners' promissory notes. While negotiating such credit-enhancement services, Commonwealth gave agents of INA drafts of Overlord III and IV documents, including the investor disclosure statements known as private placement memoranda ("PPMs").

INA's agents and their counsel reviewed the PPMs and other documents, evaluated the success of past Commonwealth syndications, and hired a firm to report on the geologic and economic viability of the programs. INA ultimately approved the programs, but only after Commonwealth consented to changes in the PPMs and in the fee and financing arrangement of the Overlord III and IV programs.

In the fall of 1984, Joseph Ace and Stephen Gunnels solicited the Overlord III and IV limited partnership units to John W. Morris, Rebecca S. Red, John T. and Bernice Person, Graham and Sherrie Glass, and Earl and Audrey Lowe ("the Investors"). Ace, the Administrative General Partner and Managing Broker–Dealer of Overlord III and IV, was the broker for all of the Investors except Red. Gunnels was Red's personal broker. Ace and Gunnels exaggerated the prospects and potential rewards of the Overlord programs while minimizing the risks and misrepresenting the returns on past Commonwealth programs. Ace and Gunnels touted the fact that INA had thoroughly reviewed the Overlord programs, suggesting that INA's approval and underwriting of the programs meant that they were trustworthy, solid investments expected to generate two- and three-fold returns with a minimum of risk.

Ace and Gunnels provided the Investors with the PPMs for Overlord III and IV, consisting of over 200 pages, but the Investors did not read them fully. They instead relied on the summary at the beginning of the PPMs and Ace's and Gunnels's representations concerning the programs. Both the Overlord III and IV PPMs contained the following conspicuous notice near the front of the PPMs:

NO DEALER, SALESMAN, OR ANY OTHER PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS ON BEHALF OF THE PARTNERSHIP OR THE GENERAL PARTNERS RELATED TO THIS OFFERING OTHER THAN AS SET FORTH IN THE OFFERING MEMORANDUM.

The Glasses, Lowes, and Persons each purchased one $20,000 unit of Overlord III. Red purchased one unit of Overlord III and two units of Overlord IV. Morris purchased two units of each program. Each of the Inves-

tors signed several agreements included in the back of the PPMs, including the subscription agreement, a promissory note for $15,-000 per unit, a surety bond application form, and an indemnification agreement whereby the Investors (the principal on the surety bond) promised to indemnify INA in the event INA was required to honor the bond.

In 1985, revenues generated by the Overlord programs covered the first installment payments on the promissory notes, but the revenues ceased in 1986. The Investors defaulted on their promissory notes.[1] The lenders demanded payment from INA on its bonds, which INA honored. INA then demanded reimbursement from the Investors pursuant to their promissory notes, which the lenders assigned to INA, and the indemnification agreements.

The Investors did not reimburse INA, and INA sued them. The Investors counterclaimed for violations of the Texas Deceptive Trade Practices Act ("DTPA"), the Texas Securities Act ("TSA"), fraud, conspiracy, and breach of the duty of good faith and fair dealing. The Investors alleged that they were fraudulently induced to purchase the Overlord investments by being misled to believe the investments were safe and low-risk. They claimed that INA was jointly responsible for the fraud for several reasons, including: (1) the surety bond and indemnification agreements were packaged with the subscription agreements in the Overlord PPMs and were simultaneously marketed to and executed by the Investors; (2) Ace and Gunnels, the investment advisers who solicited the Investors' purchases of the limited partnership interests, acted not only as sales agents for Commonwealth, but also as soliciting agents for INA's surety and indemnity agreements; (3) Ace and Gunnels promoted INA's underwriting of the Overlord programs as proof of the soundness of the Overlord programs; (4) INA reviewed the Overlord PPMs and refused to underwrite the programs until Commonwealth agreed to make structural changes to the Overlord programs; (5) INA required leveraged purchases of at least eighty percent of the partnership units in order to maximize the bond premiums it received; (6) INA knew that John Meatte, Commonwealth's president, had been enjoined by the SEC from selling unregistered securities, but failed to disclose this material information to the Investors; and (7) INA entered into a joint collection agreement with Commonwealth to pursue reimbursement from the Investors and continued its collection efforts even after discovering that Commonwealth had defrauded the Investors.

The jury found that the indemnification agreements and promissory notes did not bind the Investors to INA. The jury found, favorable to the Investors' counterclaims, that INA materially aided securities violations committed by Commonwealth, Ace, and Gunnels in the sale of the Overlord securities; that INA was liable for fraud, conspiracy to commit a fraud, and unconscionable acts in violation of the DTPA; and that INA willfully breached its duty of good faith and fair dealing toward Red. However, the jury also found that INA did not misrepresent the surety bond or INA's sponsorship, approval, affiliation, or connection with Commonwealth or the Overlord programs. The trial court rendered judgment for the Investors based upon the jury findings of unconscionable conduct under the DTPA. The court of appeals affirmed, holding that Ace and Gunnels, who furnished the Investors with the surety bond and indemnity agreements, were dual agents for INA and Commonwealth. 928 S.W.2d at 157.

We conclude that Ace's and Gunnels's actual and apparent agency authority on behalf of INA extended only to representations concerning the insurance product and not also the investment product. Consequently, there is no evidence to support the jury's verdict of fraud, conspiracy to commit fraud, or DTPA violations. We also hold that INA owed no duty of disclosure under the Texas Securities Act. However, because INA violated the Insurance Code by allowing Ace and

---

1. Red had attempted to prepay the remaining $44,635.99 she owed on her notes in December of 1995 by wiring the money, as a Commonwealth employee had instructed her, to an escrow agent. The money was never applied to Red's notes, which had been assigned to various lenders. *See infra* at 679–680.

Gunnels to act as soliciting agents on behalf of INA even though they were not registered, we hold that the Investors' obligations under their indemnity agreements are void. Accordingly, we affirm in part and reverse in part the court of appeals' judgment, and render judgment that all parties take nothing.

## AGENCY

■ The court of appeals held that Ace and Gunnels were dual agents of INA and Commonwealth. The court reasoned that, as their principal, INA was responsible for any material misrepresentations or omissions Ace and Gunnels made about the expected risks and rewards of the Overlord programs. 928 S.W.2d at 144–47. The court relied on two theories of agency: common law agency and statutory agency under Article 21.02 of the Texas Insurance Code. *Id.* We agree that Ace and Gunnels acted as soliciting agents for INA's product, the surety bonds; however, there is no evidence that their authority as soliciting agents extended to making representations regarding the quality of the Overlord investments.

The court correctly held that Ace and Gunnels, by soliciting the Investors' purchases of the surety bonds as a part of their leveraged investment purchases, transmitting the surety bond application and indemnity agreement, and collecting the bond premiums (which were included in the Investors' $5000 down payment), were agents for INA under the Texas Insurance Code. The Insurance Code establishes that:

> Any person who solicits insurance on behalf of any insurance company ... or who takes or transmits other than for himself any application for insurance or any policy of insurance.. or transmit[s] any premium of insurance ... or do[es] or perform[s] any other act or thing in the making or consummating of any contract of insurance ... shall be held to be the agent of the company for which the act is done....

TEX. INS.CODE ANN. art. 21.02. INA argues that sureties are not subject to this provision, citing *Great American Insurance Co. v. North Austin Municipal Utility District No. 1,* 908 S.W.2d 415 (Tex.1995). In *Great*

*American Insurance Co.,* we held that sureties are not regulated as a "business of insurance" under section 21.21 of the Insurance Code. *Id.* at 423–24. However, our exclusion of sureties from the "business of insurance" was limited to section 21.21; in that decision, we acknowledged that other parts of the code expressly apply to sureties. *Id.* at 422–23; *see* TEX. INS.CODE art. 1.14–1, § 2(a)(2), art. 21.14. The consumer protection purposes of the Insurance Code would be undermined if surety bonds could be freely sold by unauthorized insurers or through unlicensed agents. *See* TEX. INS.CODE art. 1.14–1, § 1 (declaring the purposes of prohibiting the sale of insurance by unauthorized carriers or agents).

■ While Ace and Gunnels are rightly regarded as soliciting agents for INA, there is no evidence that Ace and Gunnels had *actual* authority to make representations *on behalf of INA* about the Overlord programs. The Insurance Code regulated INA's insurance product, not Commonwealth's solicitation of limited partnership interests or its abuse of INA's trade name. Since Ace's and Gunnels's actual authority was limited to representations about the surety bonds, we next examine whether Ace and Gunnels had apparent authority to make representations for INA about the investments.

■ Apparent authority arises through acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of apparent authority. *See NationsBank, N.A. v. Dilling,* 922 S.W.2d 950, 952–53 (Tex.1996) (per curiam); *Southwest Title Ins. Co. v. Northland Bldg. Corp.,* 552 S.W.2d 425, 428 (Tex.1977) ("Only the conduct of the *principal,* leading one to suppose that the agent has the authority he purports to exercise, may charge the principal through the apparent authority of an agent."). We must look beyond the permission INA gave Ace and Gunnels to collect and transmit INA's applications and bonding fees, which itself was insufficient to bestow apparent authority to provide investment counseling services about the Overlord programs. *Cf. Insurance Co. of No. Am. v. Dealy,* 911 F.2d 1096, 1101 (5th Cir.1990) (characterizing the collection of applications and bonding fees for INA by brokers of the

Commonwealth Overlord programs as a "virtually clerical function").

The court of appeals relied on the contacts and business dealings between INA and Commonwealth to hold that INA clothed Ace and Gunnels with apparent authority to make representations about the soundness of the Overlord investments. Specifically, the court cited the structural changes in the Overlord programs and PPMs upon which INA conditioned its bonding approval, INA's requirement that eighty percent or more of the partnership unit purchases be leveraged by the INA-backed notes, and the packaging of INA's bond and indemnification agreements with the PPMs. 928 S.W.2d at 144.

We disagree that these actions provided a sufficient basis for charging INA with Ace's and Gunnels's representations about the Overlord programs. Sureties routinely screen and require changes to syndicated partnership offerings before bonding them to reduce the sureties' own risks. *See Bane v. Sigmundr Exploration Corp.,* 848 F.2d 579, 581–82 (5th Cir.1988) (characterizing the screening activities of a surety as "daily grist of the mill") (quoting *Woodward v. Metro Bank,* 522 F.2d 84, 97 (5th Cir.1975)); *National Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) ("National Union had an interest in investigating the partnerships to avoid becoming obligated to a stream of future payments if limited partners should default, an event which would most likely occur only if the enterprise failed and the limited partners abandoned it."). Such actions did not convey authority to Commonwealth's broker-dealers to speak for INA about the quality of the Overlord programs. There is no evidence that INA knew and acquiesced in the knowledge that Ace and Gunnels had boasted that the programs were sound because INA was involved.

The Investors argue that by approving the PPMs, INA expressly represented that the Overlord programs were low-risk investments and simultaneously clothed Ace and Gunnels with authority to make related boasts about the investments. The PPMs included a declaration that "[d]iversified programs are best adapted to a surety bond feature" and that "[a] surety bond program should engage primarily in low-risk developmental drilling, with a relatively small proportion of its funds devoted to exploratory drills." These cautious and reserved observations provide very little basis for inferring that INA publicly endorsed the Overlord programs as safe and low-risk, or that it authorized others to do so on its behalf. More importantly, the jury expressly found that INA made no misrepresentations about INA's approval or sponsorship of Commonwealth or its oil and gas programs. Therefore, we reject the argument that through its approval of the PPMs, INA misrepresented the quality of the Overlord programs or authorized others to make such representations on its behalf.

Ace's and Gunnels's agency authority on behalf of INA extended only to the insurance product, not to the investment product. The court of appeals' reliance on *Royal Globe Insurance Co. v. Bar Consultants, Inc.,* 577 S.W.2d 688, 693–94 (Tex.1979), is misplaced. The court relied on this case to hold that the scope of Ace's and Gunnels's agency authority extended beyond their description and explanation of the insurance product. In *Royal Globe,* we held that the principal was liable for its agent's unauthorized assurances that the insured was covered for acts of vandalism even though such losses were excluded from the insurance contract. In *Royal Globe,* the principal was charged with its agent's misrepresentations concerning the principal's insurance product; the court relies in error on *Royal Globe* to charge INA with unauthorized representations about a third party's investment products. When Ace and Gunnels made representations about the quality of the Overlord investments, including their assertions that INA's backing indicated that the Overlord programs were likely to be profitable, they spoke on behalf of Commonwealth alone. We conclude that there is no evidence that INA clothed Ace and Gunnels with apparent authority to represent the quality of the investments.

Having resolved the agency question, we turn to a legal sufficiency review of each of the Investors' causes of action.

## FRAUD

■ The jury found that INA defrauded the Investors through the Investors' purchase of limited partnership interests in Overlord III and IV. To prove fraud, the Investors had to show that: (1) INA made a material representation; (2) it was false; (3) when INA made the representation it knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) INA made it with the intention that it should be acted upon by the Investors; (5) the Investors acted in reliance upon it; and (6) the Investors thereby suffered injury. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex.1997). Because the jury found that INA did not make any false misrepresentation of fact about the terms, conditions, or issuance of the surety bond, the jury's finding of fraud can only be maintained if INA made an affirmative misrepresentation or a material omission of a fact about the investment product.

Before making their investment decisions, the Investors were not contacted by INA except through Ace's and Gunnels's solicitation of the surety bond documents. As we have held that INA did not clothe Ace and Gunnels with authority to make representations about the investment product, their statements about the soundness of the Overlord programs cannot be imputed to INA. Accordingly, there is no evidence that INA made any affirmative misrepresentation of fact to induce the Investors' investments in Overlord III and IV.

We next consider the Investors' contention that INA committed fraud by failing to disclose material facts to the Investors. The Investors contend that INA should have disclosed unfavorable facts INA knew about John Meatte, Commonwealth's president. On November 7, 1980, the United States District Court for the Northern District of Illinois issued a permanent injunction enjoining Meatte from selling unregistered securities. INA became aware of the injunction when the Overlord programs were being screened for bonding approval. At that time, Bruno Trimpoli, the chairman of Commonwealth's board of directors, falsely assured INA that the injunction had been resolved

and was a moot issue. There was testimony, however, that when it prescreened Overlord III and IV for bonding, INA should have determined that the Meatte injunction was on file with an Illinois court, a Tennessee court, and the Securities and Exchange Commission, and was still in effect.

■ INA cannot be liable for the omission of the Meatte injunction unless INA had a duty to disclose the injunction to the Investors. Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship. Fiduciary duties arise as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships. *See Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex.1988) ("As a fiduciary, an attorney is obligated to render a full and fair disclosure of facts material to the client's representation.");*Johnson v. Peckham*, 132 Tex. 148, 120 S.W.2d 786, 788 (Tex.1938) (holding that partners owe each other a fiduciary duty requiring full disclosure); *Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex.1996) ("Trustees and executors owe beneficiaries a fiduciary duty of full disclosure of all material facts known to them that might affect the beneficiaries' rights") (internal brackets and quotations omitted). The relationship between a surety and a principal, however, is not generally one of a fiduciary nature. *See Associated Indemnity Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287–88 (Tex.1998).

■ Outside of the cases in which formal fiduciary duties arise as a matter of law, confidential relationships may arise when the parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest. The fact that INA's backing increased the Investors' confidence in the Overlord programs is insufficient to create such a relationship. "[M]ere subjective trust does not ... transform arm's-length dealing into a fiduciary relationship." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex.1997). There is no evidence of any prior dealings between INA and the Investors that would justify an expectation that INA reveal or require disclosure of material information regarding the

investment product. *See id.* at 177 ("[T]o impose such a relationship in a business transaction, there must be a fiduciary relationship before, and apart from, the agreement made the basis of the suit.") (internal quotation marks deleted). There is no evidence that any confidential or fiduciary relationship was created between INA and the Investors.

Consistent with this analysis, most courts have held that in general, a surety has no duty of disclosure to a principal in a leveraged investment contract. *See National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 207 (2d Cir.1989) ("[I]n general, a surety does not owe a fiduciary duty to its principal."); *In re Gas Reclamation, Inc. Sec. Litigation,* 733 F.Supp. 713, 720 (S.D.N.Y.1990) ("A surety generally does not have a duty to disclose information to its principal."); *In re Rexplore, Inc. Sec. Litig.,* 685 F.Supp. 1132, 1148 (N.D.Cal.1988) ("Indeed, a surety's obligations are generally limited to those it undertakes in the bond."); *Deloach,* 708 F.Supp. at 1379( "The research efforts [the surety] expended were solely for its own purposes; it assumed no obligation to inform others of [the investment's] merits or infirmities."); *National Union Fire Ins. Co. v. Cooper,* 729 F.Supp. 1423, 1430 (S.D.N.Y.1989) ("National Union owed them no duty either to investigate the partnership or to make disclosures about the investment."). Because INA owed no duty of disclosure to the Investors and is not bound by Ace's and Gunnels's misrepresentations concerning the investment product, there is no evidence to support the jury's finding of fraud.

### CONSPIRACY

■ To prevail on their conspiracy theory, the Investors had to establish the following elements: (1) a combination of two or more persons; (2) an object to be accomplished (an unlawful purpose or a lawful purpose by unlawful means) (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *See Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983). INA's power to require changes to the structure of the Overlord programs

and modifications to the PPMs is no evidence of any "meeting of the minds" between INA and Commonwealth to achieve any unlawful object or course of action. *See Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 857 (Tex.1968) (" 'There must be an agreement or understanding between the conspirators to inflict a wrong against, or injury on, another, a meeting of minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; in short, there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy.' "). The fact that INA did not require Commonwealth to disclose the Meatte injunction in the PPMs is no evidence of conspiracy, since INA owed no duty of disclosure to the Investors about the investment product. *See In re U.S. Grant Hotel Assoc. Ltd. Sec. Lit.,* 740 F.Supp. 1460, 1465 (S.D.Cal.1990) ("Mere receipt and review of drafts of the CPPM does not constitute substantial assistance in the alleged fraud."). There is no evidence that INA encouraged Commonwealth to withhold disclosure of the Meatte injunction, or that it knew and intended that Ace and Gunnels would mislead the Investors about the Overlord programs. For all of these reasons, the jury's finding that INA conspired with Commonwealth to defraud the Investors cannot stand.

### TEXAS SECURITIES ACT ("TSA")

■ The jury also found INA liable as an "aider" under the TSA. Texas Revised Civil Statute Article 581–33 F(2) imposes joint and several liability on any "person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security." Tex.Rev.Civ. Stat. art. 581–33 F(2). The trial court instructed the jury that for aider liability to attach, the seller had to be liable for a violation of the TSA and INA had to have been aware of the violation but had to have recklessly disregarded the fact of the violation. There is no evidence that INA was aware that Commonwealth, Ace, and Gunnels violated the TSA in the solicitation and sale of the Overlord in-

vestments. On the contrary, prior to approving the Overlord programs for bonding, INA received two opinion letters from independent counsel stating that there existed no material misrepresentations or omissions in the Overlord PPMs. The evidence that INA knew of the Meatte injunction is no evidence that INA knew that it was still in effect or that the failure to disclose the Meatte injunction constituted a TSA violation.

## DTPA

Although the jury found that INA had not made any misrepresentations about the insurance product—the surety bond—it found, nevertheless, that INA had committed unconscionable acts that were the producing cause of damages to the Investors. This finding predicated the Investors' award under the DTPA, which the court of appeals affirmed.

### Consumer Status

■■■■ To recover under the DTPA, the Investors had to prove that they were consumers of goods or services and "that the goods or services purchased or leased ... form the basis of the complaint." *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 539 (Tex.1981); *see* TEX. BUS. & COM.CODE § 17.50(a). The DTPA defines a "consumer" as one who "seeks or acquires by purchase or lease, any goods or services." TEX. BUS. & COM.CODE § 17.45(4). The Investors claim that they were consumers not only of INA's insurance services, but also of INA's prescreening services, which they analogize to the investment counseling services of a full-service broker. While we agree that the Investors were consumers of INA's credit-enhancement services, we disagree that the Investors were consumers of the risk-evaluation procedures INA performed in determining which programs it would bond. *See Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.,* 88 F.3d 347, 356 n. 12 (5th Cir.1996) (denying consumer status for a lender's underwriting services, including due diligence, concluding that they were solely for the lender's benefit), *cert. denied,* — U.S. ——, 117 S.Ct. 740, 136 L.Ed.2d 679 (1997); *Deloach,* 708 F.Supp. at 1379 (S.D.N.Y.1989) ("The research efforts National Union expended were solely for its own purposes....").

The court of appeals cited *Frizzell·v. Cook,* 790 S.W.2d 41, 47 (Tex.App.—San Antonio 1990, writ denied), to support its holding that the Investors qualified for consumer status about the advice Ace and Gunnels provided about the soundness of the investment, particularly Ace's and Gunnels's emphasis on INA's involvement in underwriting the programs. 928 S.W.2d at 149. In *Frizzell,* the court found that full-service investment broker E.F. Hutton & Company could be liable under the DTPA for misrepresentations made in the course of investment advice when the advice was inextricably intertwined with the purchase of the securities and when E.F. Hutton was paid a substantial premium over that necessary to execute the securities transaction. 790 S.W.2d at 43. Unlike *Frizzell,* in which the investment research and advice services were created specifically for the benefit of E.F. Hutton's customers, INA's screening procedures were done for its own benefit. Moreover, the premiums on INA's surety bonds—1.5% of the annual outstanding principal and interest financed—were modest in relation to the obligations INA assumed in the event the Investors defaulted. *See Abbott v. The Equity Group, Inc.,* 2 F.3d 613, 622 (5th Cir.1993) (noting that the surety received a premium of only $257,060 for a bonding risk of almost $5 million); *Deloach,* 708 F.Supp. at 1384 ·(rejecting assertion that surety was motivated to "railroad[ ] the deal through in order to earn its fee" when surety received a premium of "only 1.4% of the dollar amount of each Note it guaranteed").

The court of appeals also relied on *First Federal Savings & Loan Ass'n v. Ritenour,* 704 S.W.2d 895 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.), in holding that the Investors were consumers of INA's financial counseling services for purposes of the DTPA. 928 S.W.2d at 149. In *Ritenour,* a husband was advised by a First Federal employee that he could place a "hold" on the certificate of deposit that he held jointly with his wife, so that both of their signatures would be required to make a withdrawal.

704 S.W.2d at 897. After executing the hold, the wife, acting alone, withdrew and dissipated $11,215.96. *Id.* The court held that the husband was a DTPA consumer of First Federal's counseling services because they were incidental to the husband's purchase of the certificate of deposit. *Id.* at 900.

*Ritenour* is distinguishable from this case. In *Ritenour,* First Federal's counseling services concerned the very product it sold—the certificate of deposit. Here, the Investors seek consumer status for counseling services about Commonwealth's investment product, not INA's insurance product. Although Ace and Gunnels emphasized INA's name in encouraging the Investors to purchase partnership interests, the Investors were not *INA*'s consumers concerning such advice because Ace and Gunnels lacked INA's authority to speak on its behalf about the soundness of the investment.

We conclude that the Investors were not consumers of INA's prescreening or investment-counseling services. But because we agree that the Investors were consumers of INA's credit-enhancement services, we decide whether the evidence is legally sufficient to support the jury's finding that INA committed an unconscionable action or course of action concerning the credit-enhancement services it provided to the Investors.

### Unconscionable Acts

Section 17.50 of the DTPA provides that a consumer may recover actual damages for "any unconscionable action or course of action" that is the producing cause of the damages. Tex. Bus. & Com.Code § 17.50(a)(3). The DTPA defines an "unconscionable action or course of action" as "an act or practice, which ... takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree." *Id.* § 17.45(5)(A). Unconscionability under the DTPA is an objective standard for which scienter is irrelevant. *Chastain v. Koonce,* 700 S.W.2d 579, 583 (Tex.1985) ("This should be determined by examining the entire transaction and not by inquiring whether the defendant intended to take advantage of the consumer or acted with knowledge or conscious indifference."). To prove

an unconscionable action or course of action, a plaintiff must show that the defendant's acts took advantage of her lack of knowledge and "that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Id.* at 584.

The court of appeals cited several allegedly unconscionable courses of action by INA, including: (1) INA's failure to disclose that 75% of its own risk was covered through reinsurance by the Colony Insurance Company; (2) INA's failure to disclose the Meatte injunction; (3) INA's failure to ensure that licensed agents presented and explained the surety bond agreements; (4) Ace's and Gunnels's promotion of INA's underwriting of the Overlord programs as proof that they were sound investment opportunities; (5) INA's failure to require the lenders to timely make demand for payment before it honored the surety bonds; and (6) INA's pursuit of collection efforts against Red despite her prepayment of the notes. 928 S.W.2d at 150–51.

### Nondisclosure of Colony Reinsurance

We reject the first ground of recovery under the DTPA—INA's allegedly unconscionable conduct in failing to disclose that it assumed only 25% of the risk under the surety bonds. This conflicts with the jury's finding that INA did not fail to disclose any material information concerning the surety bond.

### Nondisclosure of Meatte Injunction; Misuse of INA's Name

We also reject the second and fourth grounds of recovery under the DTPA, for the Investors were consumers only of INA's credit-enhancement services, not of its investment-counseling or underwriting services. As INA was in the business of selling its insurance, not the Overlord partnership interests, it did not owe the Investors a duty to verify and disclose the existence of the injunction. For similar reasons, Ace and Gunnels had no authority to purport that INA's underwriting services proved that the programs were solid, low-risk investments promising two- and three-fold returns.

### Insurance Code Violations

■ As consumers of INA's insurance services, the Investors claim that INA's use of unlicensed agents to solicit their surety bonds was unconscionable conduct under section 17.50(a)(3) of the DTPA. Under Article 21.01 of the Texas Insurance Code, the Investors were statutorily entitled to have licensed insurance agents present and solicit the surety bond applications and fees:

> It shall not be lawful for any person to act within this State, as agent or otherwise, in soliciting or receiving applications for insurance of any kind whatever, or in any manner to aid in the transaction of the business of any insurance company incorporated in this State, or out of it, without first procuring a certificate of authority from the Board.

TEX. INS.CODE art. 21.01. Suretyship companies are expressly subject to these licensing requirements. *Id.* art. 1.14–1, § 2(a)(2), art. 21.14; *see Great Am. Ins. Co.*, 908 S.W.2d at 422–23 (Tex.1995) (acknowledging that parts of the Insurance Code relating to unauthorized insurance apply to sureties).

Although INA violated the Insurance Code by allowing Commonwealth's agents to solicit its surety bond applications and fees, there is no evidence that this was a producing cause of the Investors' damages. Had INA presented the surety bond applications with its own licensed agents, it would not have precluded Ace and Gunnels from making representations about the soundness of the Overlord programs or from touting INA's involvement in the programs.

The Investors claim that INA's violation of the Insurance Code allowed Ace and Gunnels to also misrepresent the Investors' obligations under the surety bonds. They complain that Ace and Gunnels misled them to believe that in the event of default they risked, at most, the loss of their partnership interests. However, the jury found that INA made no misrepresentations about the terms or conditions of the surety bond. These jury findings are supported by the language of the PPMs themselves, which disclosed that

the Investors were personally liable on the bonds.

Since Ace's and Gunnels's solicitation of the surety bond documents and fees were not a producing cause of the Investors' damages, such conduct cannot support a recovery under the DTPA.

### Honoring Bonds Subsequent to Lender's Untimely Demand

■ The court of appeals cited as further unconscionable conduct by INA its failure to "require the lenders to timely make demand for payment before it honored the surety bonds." 928 S.W.2d at 150. The surety bonds, which detailed the rights and obligations of the obligee vis-a-vis the surety in the event the principal defaulted, required the obligee to make a claim for payment no later than sixty days after the installment was due under the note. The record shows that Crossland Savings ("Crossland"), the assignee of the Investors' Overlord III notes, made demand upon INA for payment on January 15, 1987, more than sixty days after October 30, 1986, the due date of the installment on which the Investors first defaulted. INA, in accordance with its bond, properly refused to pay. Crossland was careful to make timely demand for payment after subsequent installments came due. INA honored Crossland's subsequent demands.[2] The Investors argue, however, that INA was contractually bound to refuse all subsequent demands for payment from Crossland since Crossland accelerated maturity of the notes when it made its January 15, 1987 demand, as it was entitled to do under the notes and the bonds. On the contrary, the surety contract bond provided the following:

> [T]he failure by the Obligee to file such claim with respect to the unpaid installment within [the sixty day] time period shall result in the loss by the Obligee only of its right to receive payment from the Surety hereunder of the amount of such unpaid installment and shall in no way adversely affect or impair (a) the Obligee's right to file claim(s) hereunder, at any time at which the Principal shall fail to make

**2.** INA never paid Crossland for the installment due October 30, 1986, and INA has not sought

indemnification from the Investors for that installment.

any payment due under such Note, for payment by the Surety of the amount of any other installment(s) due under such Note, (b) the Surety's obligations hereunder to pay all such other installments, or (c) the Obligee's right to receive payment from the Surety hereunder of any and all amounts other than the amount of such unpaid installment.

The plain terms of the surety bond contract required INA to honor Crossland's subsequent timely demands for payment. Accordingly, INA's conduct in honoring these obligations does not create any basis for liability under the DTPA.

### Collection Efforts Against Red

 The court of appeals also cited INA's collection efforts against Red as unconscionable on the basis that Red, by prepaying her notes, had not defaulted on them. That holding assumes that Red was not in default to the holder of the notes. The record does not support that assumption.

The promissory notes signed by each of the Investors explicitly provided for a right of prepayment. The notes also directed that payments were to be sent to the partnership address "or at such other place as may be designated in writing by the holder of this note." In January, 1985, Red received a letter from Commonwealth informing her that her Overlord III promissory note had been assigned to a lender. The letter directed her to make future installments payable to that lender and to mail them to the Bank's New York address. However, the letter also told Red to contact John Meatte at his Commonwealth office if she had any questions about the assignment or her obligations thereunder.

In December 1985, Red called the Commonwealth office to ask how she could prepay the remaining $44,635.99 in principal and interest owed on her three note obligations. A Commonwealth employee told Red that the lenders to which the notes had been assigned did not permit prepayment and advised her to wire the money to an escrow agent. Commonwealth promised that withdrawals would be made from the interest-bearing escrow fund to pay the installment obligations as they came due. So advised, Red wired the money and received a signed confirmation from Commonwealth's attorney that full payment of her notes had been received.

Red's escrow funds were never properly applied to her debt; the record does not indicate how they were misapplied. Suffice it to say that Crossland Savings and Credit Lyonnais, the assignees of Red's notes, did not receive payment. Crossland and Lyonnais first notified INA on January 15 and February 12, 1987, respectively, that Red had defaulted on her Overlord III and IV notes. INA denied Crossland's first demand because it was untimely; however, it honored all of Lyonnais' demands and Crossland's subsequent demands without making any inquiry to confirm the defaults.

Red alleges that because she did not default on her notes, Crossland and Lyonnais had no right under the surety bond contract to demand payment from INA. By honoring their demands for payment without investigating whether or not Red had in fact defaulted, Red claims that INA acted unconscionably. Red's argument fails, however, because Red was technically in default, although through no fault of her own.

Crossland and Lyonnais were holders in due course of Red's notes; their right to receive payment from Red was not extinguished by Red's attempted prepayment into a Commonwealth escrow account. TEX. BUS. & COM.CODE §§ 3.302 & 3.305; *see Guaranty Fed. Sav. Bank v. The Horseshoe Operating Co.*, 793 S.W.2d 652, 656 (Tex.1990). Accordingly, when these lenders ceased receiving the note installments after Red's escrowed funds were misappropriated, Red was in default, notwithstanding her good faith attempt at prepayment. Crossland and Lyonnais were entitled to demand payment from Red's surety, INA, and INA was contractually obligated to honor those demands. In *Universal Metals and Machinery, Inc. v. Bohart*, 539 S.W.2d 874, 877 (Tex.1976), we held that when the parties "waive[ ] any requirement that the holder of the note must exhaust its rights or take action against the maker . . . . the court should not again write those conditions into the note. We should interpret the instrument by the standard of performance

upon which the parties agreed." Accordingly, INA did not commit any unconscionable acts by honoring these demands.

■ Red further argues that even if INA was obligated to honor the lenders' demands, INA acted unconscionably in its collection efforts against her. In December 1986, INA entered into a joint collection agreement with Commonwealth, initiated collection efforts against Red, and persisted in these attempts even after learning of Red's prior payment. Red claims that when it jointly established collection procedures with Commonwealth, INA *should have* obtained information from Commonwealth that Red had prepaid her note. By doing so, Red claims, the escrowed money might have been protected and applied to pay Red's notes.

According to the terms of the Collection Procedure Agreement between INA and Commonwealth, Commonwealth was required to "notify INA on the day following any installment date for any Partnership notes bonded by INA ... with a list of delinquent accounts." However, there is no evidence that Commonwealth provided INA with any notice or records of Red's prepayment into an escrow account. Nor is there any evidence that had INA received such notice in December 1986 Red's escrow funds could have been protected. The record reflects that Crossland reported that Red first defaulted on her Overlord III promissory note on October 30, 1986, indicating that Red's escrow funds had been misapplied before INA ever entered into the collection agreement with Commonwealth. The record also reflects that INA was not notified of possible fraud until the summer of 1987. Red simply presented no proof that INA's joint collection agreement with Commonwealth, into which INA entered prior to learning of Commonwealth's fraud, was unconscionable and a producing cause of damages.

### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

■ Red also asserts that by failing to investigate the existence and misappropriation of Red's prepayment, INA breached a duty of good faith and fair dealing toward

Red. In *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165 (Tex.1987), we held that an insurer may owe a duty of good faith and fair dealing towards the insured in evaluating or settling claims by the insured, when (1) the parties have unequal bargaining power; (2) the nature of the claim creates a conflict of interest between the insurance company and the insured; and (3) the "insurance company has exclusive control over the evaluation, processing and denial of claims." *Id.* at 167. However, more recently we have held that unlike a liability insurer, a commercial surety does not owe a common law duty of good faith to its principal. *See Associated Indemnity Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 280 (Tex.1998). The fundamental differences between suretyship and liability insurance and the existing commercial law duties owed by a surety do not justify an independent duty of good faith. *See id.* at 281–82; *Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1,* 908 S.W.2d 415, 418–20 (Tex.1995). Red does not allege, nor is there any evidence, that INA contractually agreed to act in good faith. *See Associated Indemnity,* 964 S.W.2d at 282–86.

In sum, we hold that there is no evidence to support the Investors' claims against INA based on fraud, conspiracy to commit fraud, securities violations, DTPA violations, or breach of the duty of good faith and fair dealing.

### · INDEMNIFICATION

■ We turn now to INA's claim that it is entitled to enforce its indemnification agreements against the Investors. Because INA solicited and procured the bond and indemnification agreements in violation of the Texas Insurance Code, we hold that the indemnification agreements are void for illegality. By soliciting the bond and indemnity agreements through Ace and Gunnels, INA violated Article 21.07 of the Insurance Code, which at the time of the transactions provided:

No person ... shall act as an agent of any ... insurance carrier ... unless he or it shall have first procured a license from the State Board of Insurance ... and no such

insurance carrier shall appoint any person ... to act as its agent unless such person ... shall have obtained a license under the provisions of this Article....

Act of Sept. 19, 1969, 61st Leg., 2d C.S., ch. 25, § 1, 1969 Tex. Gen. Laws 168, 170, *amended by* Act of June 9, 1997, 75 th Leg., R.S., ch. 596, § 1, 1997 Tex. Gen. Laws 2083, 2083 (current version at TEX. INS.CODE art. 21.07(1)(a)). Ace and Gunnels were not licensed insurance sales agents. INA further violated the Insurance Code by having Scott Frayser sign the bonds on behalf of INA. At the time of the transactions, Article 21.09 provided that:

> Any ... surety ... legally authorized to do business in this State is hereby prohibited from authorizing or allowing any ... nonresident of the State of Texas to issue, or cause to be issued, to sign or countersign, or to deliver, or cause to be delivered, any policy or policies of insurance on ... persons located in this State, except through regularly licensed local recording agents of such companies in Texas.

Act of June 28, 1951, 52nd Leg., R.S., ch. 491, 1951 Tex. Gen. Laws 868, 1065–66, *repealed by* Act of June 9, 1997, 75 th Leg., R.S., ch. 596, § 24, 1997 Tex. Gen. Laws 2083, 2102. Frayser was not at any time a licensed local recording agent of the State of Texas. These violations compromised the enforceability of the Investors' obligations under the bond and indemnification agreements.

The dissent asserts that surety agreements were not "policies of insurance" within the contemplation of Article 21.09. *See* 981 S.W.2d at 682 (Hecht, J., dissenting). The Insurance Code, however, explicitly defines the business of insurance to include "[t]he making of or proposing to make, as guarantor or surety, any contract of guaranty or suretyship as a vocation and not merely incidental to any other legitimate business or activity of the guarantor or surety." TEX. INS.CODE art. 1.14–1, § 2(a)(2). Although we have held that this provision does not define the "business of insurance" as used in Article 21.21, *see Great Am. Ins. Co.,* 908 S.W.2d at 424, it does not follow that surety agreements were not policies of insurance under Article 21.09. Unlike Article 21.21, Article

21.09 expressly included "surety[ ] or fidelity insurance compan[ies]" within the ambit of its regulations. *See* Act of June 28, 1951, 52nd Leg., R.S., ch. 491, 1951 Tex. Gen. Laws 868, 1065–66 (repealed 1997). Also, Article 21.09 excluded bid bonds, a specific kind of surety bond, from regulation. "It is a familiar rule of statutory construction that an exception makes plain the intent that the statute should apply in all cases not excepted." *State v. Richards,* 157 Tex. 166, 301 S.W.2d 597, 600 (1957). This further suggests that the article's regulations were intended to pertain to a surety company's bonds in general.

Article 1.14–1 of the Insurance Code articulates several public policies served by the requirement that insurance agents be licensed by the State Board of Insurance:

> The Legislature declares that it is ... concerned with the protection of residents of this state against acts by persons and insurers not authorized to do an insurance business in this state by the maintenance of fair and honest insurance markets, by protecting the premium tax revenues of this state, by protecting authorized persons and insurers, which are subject to strict regulation, from unfair competition by unauthorized persons and insurers and by protecting against the evasion of the insurance regulatory laws of this state.

TEX. INS.CODE art. 1.14–1, § 1. Since the transactions that took place in the fall of 1984 between INA and the Investors, the Legislature has amended the Insurance Code to include even more strongly worded language:

> It is the sense of the Legislature that persons engaging in the business of insurance without statutory authorization constitute an imminent peril to the public welfare and should immediately be stopped and enjoined from doing so, but that the State Board of Insurance and the State of Texas should be able to choose at any time any available remedy or action to bring about such a result without regard to prior proceedings under this section.

*Id.* art. 1.14–1, § 3(h).

We refuse to enforce the Investors' indemnity agreements with INA, for to do otherwise would frustrate the purposes and public policies behind the Insurance Code. *See Ben-*

*efits Admin. Corp. v. Rearick,* 705 S.W.2d 234, 236 (Tex.App.—Texarkana 1986, no writ); *Armstrong v. Tidelands Life Ins. Co.,* 466 S.W.2d 407, 409 (Tex.Civ.App.—Corpus Christi 1971, no writ); *Tidelands Life Ins. Co. v. Armstrong,* 414 S.W.2d 196, 197 (Tex. Civ.App.—Austin 1967, no writ); *Perkins v. Lambert,* 325 S.W.2d 436, 440 (Tex.Civ. App.—Austin 1959, writ dism'd); *Stone v. Sterling Mutual Life Ins. Co.,* 127 S.W.2d 345, 347 (Tex.Civ.App.—Galveston 1939, no writ); *American Const. Co. v. Kraft,* 264 S.W. 636, 640 (Tex.Civ.App.—Galveston 1924, no writ) (all refusing to enforce commission-splitting agreements with unlicensed persons because the underlying activity violated Articles 21.01 and 21.07 or their equivalents). In *M.M. M., Inc. v. Mitchell,* 153 Tex. 227, 265 S.W.2d 584, 585 (1954), we held that M.M.M. did not have to pay Mitchell for his engineering services because Mitchell failed to pay a five dollar state registration fee statutorily required to practice professional engineering. Because the declared purpose of certifying professional engineers was "to safeguard life, health and property," we held that to allow him to recover under a contract for engineering services would undermine the purposes of the statute regulating the practice of professional engineering. *Id.* Likewise, because INA failed to acquire the bond and indemnity agreements through properly licensed agents, it would undermine the purposes of the Insurance Code to enforce INA's claims for reimbursement against the Investors.

## CONCLUSION

For the foregoing reasons, we reverse the court of appeals and render judgment that each side take nothing.

HECHT, Justice, filed a dissenting opinion, in which OWEN, Justice joined.

1. *See* Act of Sept. 19, 1969, 61 st Leg., 2d C.S., ch. 25, § 1, 1969 Tex. Gen. Laws 168, 170, amended by Act of June 9, 1997, 75 th Leg., R.S., ch. 596, § 1, 1997 Tex. Gen. Laws 2083 (current version at TEX. INS.CODE art. 21.07(1)(a)); Act of June 28, 1951, 52 nd Leg., R.S., ch. 491, 1951 Tex. Gen. Laws 868, 1065–1066, repealed by Act of June 9, 1997, 75 th Leg., R.S., ch. 596, § 24, 1997 Tex. Gen. Laws 2083, 2102 (formerly TEX. INS.CODE art. 21.09). *See also* Act of May 9, 1985, 69 th Leg., R.S., ch. 203, § 1, 1985 Tex. Gen. Laws 790 (current version at TEX. INS.CODE art. 21.02).

HECHT, Justice, joined by OWEN, Justice, dissenting.

The Insurance Code requires that "policies of insurance" be issued solely through licensed agents.[1] The persons who provided the Investors in this case with INA's surety bonds to secure their promissory notes were not licensed agents. Thus, if INA's surety bonds were "policies of insurance", the issuance of the bonds violated the Code, the violation tainted the Investors' agreements to indemnify INA for any obligations it incurred based on the surety bonds, and those agreements were therefore unenforceable, as the Court holds. But if INA's surety bonds are not insurance policies, then the Investors are obliged to indemnify INA for payments made on those bonds.

The United States Supreme Court has observed that "the usual view, grounded in commercial practice, [is] that suretyship is not insurance."[2] This Court held in *Great American Insurance Co. v. North Austin Municipal Utility District No. 1* that there are "fundamental differences between a liability insurance contract and a surety bond."[3] Unlike classic insurance, where the risk is controlled only by chance, the risk attendant to surety arrangements is entirely within the control of one of the three parties.[4] Here, the Investors' default was voluntary: after paying one installment on their notes, all of the Investors simultaneously defaulted. Moreover, a surety's potential liability differs from that of an insurer. As we explained in *Great American:*

> Unlike a liability insurance contract, in which the obligation of the insurer to the insured is the primary obligation of indem-

2. *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 140 n. 19, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) (citing Cushman, *Surety Bonds on Public and Private Construction Projects,* 46 A.B.A.J. 649, 652–653 (1960)).

3. 908 S.W.2d 415, 418 (Tex.1995); *see Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 282 (Tex.1998).

4. LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE 3D, § 1:18, at 1–31 (1997).

nity to the insured for loss, the obligation of a surety to a bond obligee is secondary to the obligation owed by its principal. A party sustaining a loss covered under a liability insurance contract can look only to its insurer for recourse. A bond obligee has a remedy against its principal.[5]

Other aspects of the parties' relationships in this case indicate that INA was not dealing in insurance. The surety bond premiums were paid by the Investors in advance and were not subject to adjustment. Further, the surety bonds, unlike policies of insurance, were not subject to cancellation or renewal and had no fixed terms of duration. Finally, the instruments contain no element of risk-shifting or pooling of risks, both of which are quintessential elements of insurance contracts.[6]

In *Great American*, the Court concluded that surety companies issuing surety bonds are not engaged in the business of insurance for all purposes under the Insurance Code. Specifically, the Court held that surety companies are not subject to the regulations of Article 21.21. I fail to see how a surety company is not, by issuing surety bonds, engaged in the business of insurance, if surety bonds can be insurance policies. It is true, as the Court says, that the issuance of surety bonds is included in the business of insurance as defined by Article 1.14–1, Section 2(a)(2) of the Insurance Code. But as the Court explained in *Great American*:

> Nowhere in the "purpose" clause of article 1.14–1 did the Legislature indicate that the list of acts contained therein which constitute "doing an insurance business" was to apply throughout the Code. Rather, the purpose clause of article 1.14–1 points out that in defining "what constitutes doing an insurance business," the Legislature was exercising its power to address its explicitly listed concerns. The expressed concerns do not evidence an intention to promulgate a uniform definition of the acts which constitute doing an insurance business; rather, they indicate concern that

particular parties may escape the jurisdiction of the State Board of Insurance and evade suit by contractual beneficiaries.[7]

Just as there is no indication in the Insurance Code that the issuance of surety bonds was to be subject to the regulations of Article 21.21, there is likewise no indication that the licensing requirement of the Code was intended to apply to persons issuing surety bonds.

The Court infers from the express exclusion of bid bonds from regulation in former Article 21.09 that other types of surety bonds were not intended to be excluded. But the inference is just as likely that the Legislature intended, by excluding bid bonds, to exclude similar surety bonds. In any event, Article 21.09 has been repealed.

I do not, of course, venture an opinion regarding whether issuers of surety bonds *should* be licensed. That issue is properly one for the Legislature or perhaps the Department of Insurance. The only question here is whether a surety bond is an insurance policy within the meaning of the licensing provisions of the Insurance Code. In my view, this Court's decision in *Great American* compels a negative answer. For this reason, I would enforce the indemnification agreements. Accordingly, I respectfully dissent.

---

**5.** 908 S.W.2d at 418–419.

**6.** *Steere Tank Lines, Inc. v. United States*, 577 F.2d 279, 280 (5 th Cir.1978) ("Risk shifting or

risk distribution is one of the requisites of a true insurance contract.").

**7.** *Great American,* 908 S.W.2d at 423.