**Jo Ann E. COMBS, As Trustee of the Irene Ashworth Vencill Trust, Appellant,**

v.

**Wayne GENT, Appellee.**

No. 05–03–01781–CV.

Court of Appeals of Texas, Dallas.

Aug. 2, 2005.

Rehearing Overruled Feb. 11, 2006.

Richard B. Schiro, Greg E. Butts, Law Offices of Richard B. Schiro, Dallas, for appellant.

Bruce Monning, Monning & Wynne, L.L.P., Dallas, for appellee.

Before Justices MOSELEY, BRIDGES, and FRANCIS.

## OPINION

Opinion by Justice BRIDGES.

Jo Ann E. Combs, as trustee of the Irene Ashworth Vencill trust, appeals the jury's verdict in favor of Wayne Gent on Combs' breach of fiduciary duty and legal malpractice claims. Following the jury's verdict, the trial court entered a take-nothing judgment in favor of Gent. In four issues, Combs argues the jury's verdict that Gent did not breach his fiduciary duty or commit legal malpractice is so against the great weight and preponderance of the evidence that it is clearly unjust and the trial court erred in allowing Gent to introduce evidence allegedly showing Combs filed false tax returns and in awarding attorney's fees to Gent. We affirm the trial court's judgment.

In December 1997, Gent received a call from Jennie Gilliam regarding the hiring of an attorney to take care of the business affairs of Irene Vencill. Jennie was Vencill's caretaker. Gent met with Vencill, who indicated she was tired of dealing with her nieces and nephews regarding money matters, and she wanted a lawyer to take care of her finances. Vencill also advised Gent that he would have to deal with her nieces and nephews, and they "would probably end up suing" Gent.

Jennie testified that Doris Weaver had previously helped Vencill with her financial affairs and taxes, but Vencill believed Weaver had taken $15,000 from her. According to Jennie, "someone" called Adult Protective Services, and a representative came and talked with Vencill "for about three hours." The representative told Jennie she needed to hire a lawyer for Vencill. Jennie called Elizabeth Ditto, Vencill's niece, because Jennie was "not family." Jennie and Ditto were present at Gent's first meeting with Vencill. Gent was the fifth lawyer Jennie contacted regarding helping Vencill. Vencill told Gent she needed someone to "take over all of her affairs" and discussed Gent taking over her "whole estate" and her taxes. During the discussion with Vencill, Gent asked if Vencill had any questions, and Vencill said she "perfectly understood." Gent discussed forming a trust and whether Vencill wanted to pay him a five percent fee or an hourly rate, and Vencill said she

wanted to pay the five percent fee. When Gent agreed to take over Vencill's affairs, Vencill told Gent, "I worry about it because, when I die, it's going to be one bloodshed war." After Gent took over Vencill's affairs, Vencill seemed to gain peace of mind and became "very content." Gent came by two or three times a week and called "several times."

Gent formed a trust naming himself as trustee and his daughter and two sons as co-trustees in the event Gent was unable to be the trustee. Gent had asked Vencill about who would take care of her business if something happened to him, and Vencill said she did not care, "as long as it's a lawyer." Gent told Vencill his daughter was already a lawyer, and one of his sons was in law school and the other was going to go to law school. Vencill reiterated she did not care who took over, "as long as they're a lawyer" and "not a member of the family."[1] At the time Gent formed the trust, he determined Vencill's total assets were approximately $737,000. The trust provided that Vencill was the sole beneficiary during her lifetime, and upon her death the trust assets were to be distributed to eighteen beneficiaries, most of whom were Vencill's nieces and nephews.

In January 1998, Gent took an initial $16,000 fee based on the amount of property transferred into the trust. Vencill received a bill in the mail, and Weaver met with Vencill and talked about firing Gent and discussed the fee. Weaver tried to get Vencill "to tape on a tape machine about firing [Gent] because he was stealing

from her." At a subsequent meeting with Gent, Vencill asked if it was true he had taken the fee. Gent confirmed that he had taken the fee and explained how he determined the fee. Vencill agreed to the fee and did not raise the issue again. According to Jennie, Vencill was "fine with it" after Gent explained the fee.

Gent opened the trust account and transferred various certificates of deposit and had Vencill deed all her real property into the trust. In February 1998, Gent wrote to PrimeVest Financial Services requesting that the PrimeVest fund be transferred to the trust and out of Vencill's individual name. In April, Gent wrote another letter requesting the transfer, because PrimeVest had taken no action. PrimeVest sent Gent a letter requesting that Gent sign additional forms. Gent signed all the forms and mailed them back to PrimeVest. Gent received no other information from PrimeVest and assumed they had transferred the account into the trust as the other annuities had done.[2]

On July 30, 1998, Gent sent Vencill a handwritten list of the assets he held as trustee, showing a total value of $797,122. That total assumed 156 acres in Kaufman County was worth $91,800, the value reflected on the tax rolls. In Gent's August 1999 accounting, Gent noted the tax roll value was still approximately $91,000, but Gent noted a market value of $234,000.

Vencill had a Hartford Life annuity that had a seven-year term and paid 6.5 percent interest guaranteed for the seven years. If Vencill had surrendered the an-

1. Gent's children were never paid and never served as trustees.

2. In August 1999, Gent sent PrimeVest another letter requesting liquidation of the account for distribution to the beneficiaries. In June 2000, after Combs had taken over as successor trustee, Combs learned through a phone call that PrimeVest had never transferred the account out of Vencill's name individually. Combs took no further action, though Gent testified that he would have pursued transfer of the asset into the ongoing trust even though Vencill was dead at the time of the discovery of the mistake.

nuity early, she would have had to pay a seven percent surrender charge. In January 1999, the annuity matured, and Wade Emerson, the insurance agent who had arranged the annuity, suggested rolling the annuity into a new annuity. Emerson testified there were no tax consequences to rolling the annuity into a new one, and Gent signed over the $162,092 in annuity proceeds over to a new annuity with Jackson National Life. The Jackson annuity was to pay $6329 yearly for five years and then return the $162,092 at the end of that term. Emerson testified the purpose of the annuity was to put Vencill's money in a position to preserve the principal for her care and pay an annual rate. Vencill died February 26, 1999, but the Jackson annuity paid the first year's annuity of $6349 on March 8, 1999. Upon learning of Vencill's death, Jackson sent Gent $153,076, the amount due under the annuity contract plus interest. Emerson testified that Gent was looking out for Vencill's best interests in arranging the Jackson annuity.

Six days after Vencill's death, several of Vencill's beneficiaries sent Gent a letter requesting a copy of Vencill's will and trust and a plan of action of the executor. A week later, Gent wrote to the beneficiaries informing them that Vencill's property was to be liquidated and the proceeds divided between the eighteen beneficiaries. On March 23, 1999, Gent sent Donald Archer, whose address was listed on the initial letter, a copy of the trust. By June 1999, some of the beneficiaries had hired a lawyer, Robert Somers, and Gent had provided Somers a list of assets in the trust and a general status report. On June 23, 1999, Gent met with Archer and Somers. Following the meeting, Gent wrote again to Somers and proposed that, when the monies came in from the annuities, he would make a distribution to the beneficiaries, less $100,000, and turn over to Somers the remainder plus all CDs as they matured. Gent also proposed that he provide an accounting for his expenditures since the inception of the trust.

At the same time, Somers was preparing a lawsuit against Gent on behalf of Archer and some of the other beneficiaries. The original petition was filed July 8, 1999. On August 17, 1999, Gent provided Somers an accounting and informed Somers that he needed to disburse funds to the beneficiaries as soon as possible. Gent also stated he was not opposed to being replaced as trustee, but he expressed concern about the additional costs associated with a new trustee. On August 21, 1999, Gent distributed $18,750 to each of the beneficiaries. Pursuant to a settlement between the parties, the trial court entered an order on October 27, 1999, accepting Gent's resignation and appointing Combs substitute trustee.

On October 29, 2001, Combs, in her capacity as trustee, sued Gent in Kaufman County. Combs asserted claims of breach of fiduciary duty, negligence, and legal malpractice. Combs subsequently filed a motion to transfer venue, and the case was transferred to Rockwall County. The parties stipulated the summaries of each party's attorney's fees were accurate and waived further proof of attorney's fees. The parties agreed that "all matters, including questions of fact and law and judicial discretion on the matter of attorney's fees, [would] be decided by the court without the aid of a jury." A jury found that Gent had not breached his fiduciary duty and had not committed legal malpractice. Gent filed a motion for attorney's fees and judgment, and the trial court entered a judgment that Combs take nothing and ordered Combs to pay Gent's attorney's fees of $154,071, to be reduced by certain amounts depending upon whether Combs appealed. This appeal followed.

██ In her first issue, Combs argues the jury's verdict finding Gent not guilty of breach of fiduciary duty must be reversed. In her second issue, Combs attacks the jury's finding that Gent did not commit legal malpractice. In addressing Combs' arguments, we must consider and weigh all of the evidence in the case and set aside the verdict only if we conclude "that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003). Fiduciary duties arise as a matter of law in certain formal relationships, including the attorney-client relationship. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998). Attorneys owe their clients a fiduciary duty of "most abundant good faith," requiring absolute perfect candor, openness, and honesty, and the absence of any concealment or deception. *Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 196 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

██ Combs argues Gent charged excessive fees, did not fully disclose his fees, and either "ignored or botched" a "lengthy list of administrative items." Combs complains that Gent failed to transfer into the trust the PrimeVest account; improperly "borrowed" money from the estate of Mae Reed, Vencill's sister;[3] and improperly made loans to Jennie. However, the jury heard the evidence concerning these complaints, and Combs does not show how the trust was harmed by these actions. Combs further complains Gent named his children as successor trustees; concealed the fees he was collecting for himself;

made a "remarkably ill-advised" annuity investment when he converted the Hartford Life annuity into a new annuity with Jackson; kept insufficient records; failed to attend to Vencill's health care; and failed to file tax returns. Again, the jury heard the evidence regarding these complaints.

After reviewing the record, we cannot conclude that the jury's failure to find a breach of fiduciary duty was so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Jackson*, 116 S.W.3d at 761. Gent charged a total of $61,820.28 for his services as trustee and lawyer for two years.[4] From the outset, Vencill told Gent there would be "one bloodshed war" after her death, and four other lawyers declined to take the job before Gent accepted it. Gent and Vencill discussed his fee, and Vencill "perfectly understood" their arrangement. Vencill also consented to Gent's children, one of whom was already a lawyer at the time, being named as successor trustees. The record shows Gent took repeated action to transfer the PrimeVest account into the trust, and when Combs discovered the failure to successfully transfer the account, she took no action to attempt to correct the situation. Gent's transfer of money from the Reed estate and his loans to Jennie, along with payments of his fees, were documented and the loans were paid back. The annuity Gent arranged avoided tax consequences and provided for a shorter five-year term than the previous seven-year annuity, taking into consideration Vencill's age and state of health. Gent turned over documents and records to

---

3. While we do not condone Gent's use of funds from the Reed estate, the jury had all of the evidence before them, and we cannot conclude the fact he paid in this manner fees to which he was entitled renders the jury's verdict that he did not breach his fiduciary duty so against the great weight and preponder-

ance of the evidence as to be manifestly unjust. *See Jackson*, 116 S.W.3d at 761.

4. It cost Gent $135,737 to defend himself in this case up to September 12, 2003. Combs' legal fees in this case totaled $195,268.27.

Combs after she was appointed trustee, and Combs had six months to file the estate tax return. Finally, there was no evidence that Jennie did not take care of Vencill or that Gent failed to attend to Vencill's health care. We overrule Combs' first issue.

As to the jury's finding that Gent did not commit legal malpractice, Combs focuses her argument on two loans to Jennie that called for a usurious interest rate. Gent concedes that the loans to Jennie were usurious but argues that does not mean the loans proximately caused damages to the trust. *See Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 181 (Tex.1995). In fact, the record shows the loans were extinguished when Jennie received her August 1999 distribution. As to the complaints raised in Combs' first issue, which she argues also constituted legal malpractice, we have reviewed the record and, for the reasons previously discussed, we find no merit in Combs' claims. We conclude the jury's finding that Gent did not commit legal malpractice was not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Jackson*, 116 S.W.3d at 761. We overrule Combs' second issue.

In her third issue, Combs argues the trial court erred in allowing Gent to introduce evidence Combs filed tax returns on behalf of the trust showing deductions totaling $58,920 for Gent's fees. Evidentiary rulings are committed to the trial court's sound discretion. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998). A trial court abuses its discretion when it rules "without regard for any guiding rules or principles." *Id.* An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Id.* Moreover, any error in admitting evidence is cured where the same evidence comes in

elsewhere without objection. *Schwartz v. Forest Pharm., Inc.*, 127 S.W.3d 118, 124 (Tex.App.-Houston [1st Dist.] 2003, pet. denied).

At trial, Gent cross-examined Michael Bedford, an accountant Combs hired to work for the trust. Bedford testified the Internal Revenue Service only allows deductions of reasonable compensation. From Bedford's testimony, Gent developed his position that Combs signed the tax return claiming $58,920 in deductions for Gent's fees and, by signing, Combs effectively was stating that Gent's fees were reasonable compensation. Combs objected to this line of questioning, but the trial court overruled the objection. Subsequently, during Combs' direct testimony, her attorney questioned her regarding how she could take the deduction for Gent's fees and, at the same time, file a lawsuit to get the fees back without running afoul of the IRS. Combs testified she considered that the IRS might make the argument that it was an unreasonable fee, but she took the deduction because it was actually paid to Gent, and it would have been negligent of her not to take the deduction in favor of the trust. Thus, Combs herself raised the issue of her signing tax returns taking a deduction for Gents fees, and the error, if any, in overruling her objection to this evidence was thereby cured. *See Schwartz*, 127 S.W.3d at 124. We overrule Combs' third issue.

In her fourth issue, Combs argues the trial court erred in awarding attorney's fees to Gent or, in the alternative, the award of attorney's fees was excessive. Specifically, Combs argues Gent acted with bad faith and pursued his own self interest to the detriment of the trust and the trial court therefore should have denied any recovery of attorney's fees. The Texas Trust Code provides that, in any proceeding under the code, the court

may make such award of costs and reasonable and necessary attorney's fees as may seem equitable and just. TEX. PROP.CODE ANN. § 114.064(a) (Vernon 1995). The grant or denial of attorney's fees under section 114.064 is within the sound discretion of the trial court. *Lyco Acquisition 1984 v. First Nat. Bank,* 860 S.W.2d 117, 121 (Tex.App.-Amarillo 1993, writ denied).

The jury determined Gent did not breach his fiduciary duty or commit legal malpractice. Further, the parties stipulated the summaries of each party's attorney's fees were accurate and waived further proof of attorney's fees. The parties agreed that "all matters, including questions of fact and law and judicial discretion on the matter of attorney's fees, [would] be decided by the court without the aid of a jury." Gent's proof reflected a total of $124,487.41 in attorney's fees through September 1, 2003. Combs' proof showed legal fees amounting to $195,268.27. Although Combs argues the amount of attorney's fees should have been reduced because Gent resisted Combs' motion to transfer venue and engaged in "unnecessary and losing discovery battles," the record reflects that the amount of attorney's fees was reduced to $124,821, plus appellate costs, down from $135,737. Under these circumstances, we cannot conclude the trial court abused its discretion in awarding $154,071 in attorney's fees to Gent. We overrule Combs' fourth issue.

We affirm the trial court's judgment.