Alex WANG and Serena
Wang, Appellants

v.

WEN–NING LEE, Pao–Yu Lin and
Eric C. Lee, Appellees.

No. 09–07–370 CV.

Court of Appeals of Texas,
Beaumont.

Submitted Feb. 20, 2008.

Decided June 12, 2008.

Michael D. West, West & West, LLP, Houston, for appellants.

Althea M. Bailey, Diana C. Hsiung, Houston, for appellees.

Before GAULTNEY, KREGER, and HORTON, JJ.

## OPINION

CHARLES KREGER, Justice.

Wen–Ning Lee, Pao–Yu Lin, and Eric C. Lee recovered judgment for $205,000 against Alex Wang and Serena Wang for fraud committed in the course of the sale of a business. The Wangs challenge the legal and factual sufficiency of the evidence in five issues. We reverse the judgment, render judgment in part, and remand the case in part.

Shortly after emigrating from Taiwan, Wen–Ning Lee and Pao–Yu Lin moved to Texas to learn the ice cream store business from Serena, who operated six Baskin–Robbins franchise stores in Texas and three in California. In 1998, the Lees paid the Wangs $60,000 for a one-half interest in a Baskin–Robbins store located in Spring. Wen–Ning worked at the Conroe Baskin–Robbins and Pao–Yu worked at the Spring Baskin–Robbins. In 1999, the Lees paid the Wangs $40,000 for a one-half interest in the Conroe Baskin–Robbins store.[1] Serena provided the documents they signed. Although they had purchased a one-half interest in the stores, the Lees' sole compensation was equal to or less than the $6.00 hourly wage paid to the other workers. When the Lees asked for a raise, Serena told them they would need to purchase the other one-half interest in the two stores. In May 2000, the Lees purchased one-half of the shares of a newly-formed corporation, Ice Cream King, Inc., from the Wangs for an additional $100,000.

According to Serena, the Lees purchased "100 percent, both two stores, the

---

1. Serena testified that she bought the Conroe franchise after the Lees purchased the Spring store, as follows:

   The company told me that the store was bad in management and the store for sale. It's your territory. Would you like to buy? And at that time because the Lees already partner with us so I asked them—I offered you, would you like to. And then sooner or later to get your franchise then you can get a store because Conroe store a little bit far for me.

fixtures, equipment, good will and the business." Pao–Yu testified that at that time she believed she already owned one-half of the franchise. The business operation being run at each of the locations was a Baskin–Robbins ice cream store and the Lees believed Ice Cream King was the Baskin–Robbins business operating out of the Spring and Conroe locations. Serena testified that they formed the corporation because the Lees wanted to obtain a Baskin–Robbins Franchise.[2] Serena never told them they were not working as a Baskin–Robbins and could not represent themselves "as a Baskin–Robbins person." Asked what Pao–Yu understood her relationship with Baskin–Robbins to be after June 2000, Pao–Yu testified that she believed she and Wen–Ning owned "100 percent of these two stores." Serena agreed that "[t]he Lee's family bought both stores, Conroe store and Spring store. 100 percent own stores, yes." The Lees paid the rent directly to the landlord but Serena did not transfer the leases to the Lees as she had agreed to do. The Lees operated the two stores and each month filed the sales tax returns and paid sales tax on the store's receipts. The Lees used a password Serena gave them to buy their supplies from Baskin–Robbins.

Serena Wang held the franchises for the two stores in her name as an individual and her franchise agreement with Baskin–Robbins prohibited her from transferring the franchise to a third party.[3] The Wangs did not disclose to the Lees that Serena's contracts with Baskin–Robbins did not permit her to sell her right to operate a Baskin–Robbins franchise to a third party.[4] Serena continued to hold the franchises while the Lees' son Eric completed his college education. Serena was supposed to transfer the franchises into Eric's name when Eric was ready. Meanwhile, Serena told the Lees that a "secret shopper" for Baskin–Robbins had caught Pao–Yu pocketing proceeds from a sale and placed the store on "probation."[5]

2. In response to a question asking the purpose of forming Ice Cream King, Serena replied:

> That's from the idea, from Baskin–Robbins district manager. His name is Ting Hung (spelled phonetically.) Because I told him they are my husband's friends' relative. They are really liking to own Baskin–Robbins but now they needed time to get a franchise, not a sole. Apply Baskin–Robbins franchise from the start of beginning to intervene until you got a license, either three or four months at the least. So he told me, you can form a company. Your name in the company will be okay. Put them together. Then one day they got the franchisee license there will be no problem.

3. Serena testified the franchise fee was $1,500 per year. According to Serena, the $200,000 fee did not include the Baskin–Robbins signage but did include Baskin–Robbins's furniture. She did not get permission from Baskin–Robbins to sell the furniture to the Lees.

4. Serena provided controverting testimony, as follows: "I told them, but, you don't know all the detail how to run a business. How about we start fifty-fifty, follow me how to management, how to do the stores, then during the time you can start to apply the franchise."

5. Serena testified that:

> Baskin–Robbins has a secret shopper system. Every store need to pay 39.95 for— per visit.... And the very beginning in 2000—2001 I heard some of the store got caught and shut down.
>
> ....
>
> ... It happened. So, after I got the actual message, is almost at the end of 2001. And the district manager told us be watch out, it's very strict, so everybody be more careful. Do your right real report. That very beginning I heard what is the mystery shopper did.

Serena claimed that the mystery shoppers visited all six of her stores, and she was warned by a company supervisor "seems like they caught some problem." The following week, she claimed, she received a certified letter that all six of her stores would be audited. When she asked why, someone told her the

Serena told the Lees that if they asked Baskin–Robbins to show them the document that supposedly showed they had been cheating, Baskin–Robbins would close the store down. Serena told the Lees that they would have to pay her one-half of the Spring store's profits as a management fee while the store was on "probation." The Lees continued to operate the Conroe and Spring stores, but paid Serena one-half of the profit from the Spring store. Over a three-year period, the Lees paid Serena an additional $79,000.

In 2002, the Wangs told the Lees that they were not supposed to show Baskin–Robbins any of their previous transactions. Eric graduated from college in 2004 and arranged with Baskin–Robbins to enter into a trainee program. Serena transferred some cash to Eric and they fabricated some documents to make it appear that Eric had just purchased the Conroe store, although his parents had actually paid for both of the stores several years earlier. Serena told Eric that the Spring store could not be transferred to Eric because it was on the "probation list of Baskin–Robbins." In order to enter the trainee program, Eric had to produce a written assignment of the lease to the Conroe store and Serena's approval. Although the Lees had paid the Wangs in full for the stores, Serena still held the leases. The assignment was presented to Serena, who refused to sign the document. Serena demanded one-half ownership of the Spring store, but the Lees refused. The landlord would not execute the assignment unless Serena signed it. Unable to produce an assignment of the lease, Eric could not enter the Baskin–Robbins franchisees' training program. The Lees had always ordered their supplies through Serena, who still held the franchises. Serena cut off the Lees' supplies and contacted Bas-

kin–Robbins to terminate their orders and revoke her permission to supply the Lees with Baskin–Robbins' products, and the stores closed. Asked why she refused to assign the leases when the assignment was the only impediment to the Lees' acquisition of the franchises, Serena replied that she did not cooperate because she had been served with the Lees' lawsuit.

Serena testified that in the 1998 Spring store transaction the Lees bought "50 percent of the store equipment, fixture, good will, the business for the whole business." By 2000, the Lees had purchased "100 percent, both two stores, the fixtures, equipment, good will and the business." But, Serena testified, she did not sell the franchise because she could not. Serena testified that the Lees were aware that they must obtain permission from Baskin–Robbins in order for her to transfer the franchise in early 2000, as follows:

> The very beginning even the company formed and the CPA do the document for Ice Cream King Company, they mentioned about do you know you did not buy franchisee, you buy the stores only. They say, yeah, yeah, I know, because Serena said she will help cooperate with us to apply the franchise.

Pao–Yu's account of their discussion varied from Serena's. According to Pao–Yu, Wen–Ning's sister noticed the franchises were not mentioned, and Pao–Yu asked Serena about it. Serena said "there's no problem. Any of the members of your family, as long as this person is eligible or capable of obtaining the franchise, and she would just go ahead and transfer either one or both of the stores franchisee to us[.]"

The appellants' first two issues challenge the legal sufficiency of the evidence supporting the judgment entered against

yields were a lot lower in the Spring and Conroe stores.

Alex Wang and the legal sufficiency of the evidence supporting the findings of fact as they relate to Alex Wang. The appellees concede error. We sustain issues one and two.

In their fourth issue, the Wangs challenge the legal and factual sufficiency of the evidence supporting the judgment and findings against Serena. Fraud requires proof of: (1) a material misrepresentation; (2) that was false; (3) made by the speaker as a positive assertion, with knowledge that it was false or recklessly without any knowledge of the truth; (4) made by the speaker with the intent that the other party act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998). A material omission of fact may give rise to fraud liability under circumstances where there is a duty to disclose. *See Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex.1998). In *Spoljaric v. Percival Tours, Inc.,* the court stated:

> A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act. While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony.

708 S.W.2d 432, 434 (Tex.1986) (citations omitted). Although failure to perform, standing alone, is no evidence of the intent not to perform when the promise was made, that fact is a circumstance to be considered with other facts to establish intent. *Id.* at 435.

The Wangs argue there is no evidence or insufficient evidence that Serena did not intend to transfer the franchises at the time she made the promise to do so. The denial that a promise was ever made is a factor showing no intent to perform when the promise was made. *Spoljaric,* 708 S.W.2d at 435. Serena repeatedly testified that by paying $200,000 to her the Lees purchased the entire business but that the purchase did not include her rights in the franchises or the leases. Serena also testified that she had held the franchise for the Spring store since 1985 and that in 1999 she bought the Conroe store because it was in her territory. Thus, the Lees could not obtain the franchise simply by applying to Baskin–Robbins because Serena held the rights to the franchise and by her testimony did not sell those rights to the Lees when they bought the stores. The Lees supposedly bought a one-half interest in the Conroe store at its initial acquisition by Serena, but she obtained the franchise in her name alone.

The documents through which the parties memorialized their agreement draw no such distinction between the businesses being run on the premises and the leases and franchise agreements through which the businesses were operated. When the Lees purchased the one-half interest in the Spring store, Serena as seller and Wen–Ning as buyer executed a document titled "Covenant Not To Compete And Indemnity And Hold Harmless Agreement." The contract recites the parties have entered into "a contractual agreement for the sale and transfer [of] fifty percent (50%) of the business known as BASKIN–ROBBINS, [located in Spring, TX]." In addition to the $60,000 cash paid to Serena that day, Wen–Ning also issued a check payable to Baskin–

Robbins for "inventory." When the Lees purchased the one-half interest in the Conroe store, Serena and Wen–Ning executed a document titled "Purchase and Sale Agreement." This document stated, in part, that Serena agreed to sell "half (½) of the seller's assets and business represented by Baskin Robbins franchise store # 983 located in Conroe, TX including all equipment, fixtures, goodwill, trademarks, trade names, and other intangible assets." In addition to the purchase price for "the assets" the contract gave Wen–Ning the right to purchase one-half of the existing inventory from Serena. The parties stated they "recognize that store # 983 is in need of certain updating and refurbishing of its facilities to comply with new operating agreements, guidelines, and directives established by Baskin Robbins." Wen–Ning agreed to have "50% responsibility for fifteen thousand dollars." A stated condition precedent to closing was "Purchaser shall have entered into a landlord leasing agreement acceptable to Baskin Robbins. Purchaser will pay 50% of the transfer fee of five thousand ($5,000.00) at the closing title transfer." The "Sale and Purchase Agreement of Stock" stated that Serena and Alex were selling "all of Sellers' ownership interest in a certain business ... known as 'ICE CREAM KING, INC.[,]' " that the business was being conducted at the Baskin–Robbins locations in Spring and Conroe, that "[t]he total ownership of the business is divided equally between" the sellers and the buyer, and that the total purchase price of the stock was $100,000 for "the full payment from buyer for the purchase of Sellers' ownership interest in the Business." Among the liabilities passed from seller to buyer in the agreement were "property leases." The agreement also provided for liability for sales taxes. A receipt stated Serena had received $100,000 for "50% of their ownership of Ice Cream King" plus additional sums for the inventory of the two stores and "Entitlement Fee for an additional 5–year Franchise Operation Authorization from Baskin–Robbins Company for the Conroe Store...." Thus, Serena made representations that would lead a reasonable person to believe that they were buying a franchised business, then denied that she sold either the franchises or the leases to them. Serena made additional demands when the Lees demanded performance, then refused to execute the lease assignment although she admitted that was what she was supposed to do. Serena's admission that she did not assign the leases because the Lees had filed suit explains much of Serena's behavior overall. The Wangs represented that they were selling the business, including elements that were part of the franchises, such as goodwill, furniture, access to Baskin–Robbins's inventory, and elements that are incidents of the leasehold estate, such as possession of the property. They did not really transfer these items to the Lees and Serena knew it at the time. Serena's subsequent behavior shows that she intended to retain the franchises' benefits for herself.

The Wangs argue that Wen–Ning and Pao–Yu admitted at trial that Serena was being truthful of her intent when she made the representations. The testimony relied upon in the appellants' brief does not establish a judicial admission. Wen–Ning stated in deposition that he did not know what Serena's intent was. Read in context, Pao–Yu was merely expressing her belief regarding Serena and trust in Serena at the time of the transaction and was not admitting that Serena herself possessed no intent to defraud the Lees. We hold that the evidence is legally and factually sufficient to support the trial court's finding that Serena possessed fraudulent intent at the time the promise was made.

The Wangs also argue that Wen–Ning failed to establish detrimental reliance. Detrimental reliance on the part of Wen–Ning was supplied through his wife's testimony. Although Wen–Ning stated in his deposition that he never paid attention to the Baskin–Robbins franchise and never thought of the question, there is also evidence that both Wen–Ning and Pao–Yu believed they were purchasing the entire business comprised of the Spring and Conroe Baskin–Robbins stores. The evidence is legally and factually sufficient to support the trial court's finding of detrimental reliance by Wen–Ning. We overrule issue four.

■ Issue five contends the evidence is legally and factually insufficient to support the trial court's finding that the Lees sustained damages in the amount of $205,000. "Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the-bargain measure." *Formosa Plastics*, 960 S.W.2d at 49. "The out-of-pocket measure computes the difference between the value paid and the value received, while the benefit-of-the-bargain measure computes the difference between the value as represented and the value received." *Id.*

■ First, the Wangs argue that the Lees failed to allege an out-of-pocket measure of damages. The petition alleged "Plaintiffs have suffered damages in the form of out-of-pocket expenses in order to correct the wrongs committed by Defendants, including costs of court, attorney's fees, litigation expenses and other consequential damages." The Wangs argue that the "out-of-pocket" damages referred to in this paragraph are limited to court costs, attorney's fees, and litigation expenses. They provide no authority supporting their position that the word "including" indicates an exclusive list. The word "including" suggests an illustrative list rather than an exclusive one. *See, e.g.,* Tex. Gov't Code Ann. § 311.005(13) (Vernon 2005) (" 'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded."). The request for "out-of-pocket damages" must be given the broadest reasonable construction. *See Anderson v. McRae*, 495 S.W.2d 351, 358 (Tex.Civ.App.-Texarkana 1973, no writ) ("Pleadings are to be liberally construed in favor of plaintiff and to support the judgment when there are no special exceptions."). We hold that the Lees did not confine themselves to a benefit-of-the-bargain measure of damages.

■ The Lees paid the Wangs a total of $200,000 for the two stores and Eric testified that they paid $5,000 in rent after the stores closed. There is no evidence of the value of the freezers they received and no evidence of the profit the Lees earned from the stores during the years they operated the businesses. The Lees do not argue that they established a benefit-of-the-bargain measure of damages but they do contend in the evidence that they paid the Wangs $200,000 plus an "unsubstantiated franchisor penalty" and that this therefore, establishes their "out-of pocket" damages.[6] The out-of-pocket measure of damages is restitutionary and requires the fact-finder to measure the value of that parted with against the value of that which is actually received. *See Formosa Plastics*, 960 S.W.2d at 49. The evidence is undisputed that the Lees obtained something of value—refrigerators—but no evidence of the value of what they received.

6. The appellees do not provide a record reference for the evidence of an "unsubstantiated franchisor penalty." They may be referring to the $5,000 transfer fee mentioned in the 1999 agreement to purchase the Conroe Baskin–Robbins store.

On the other hand, the Lees proved they paid $200,000 for franchise stores but they received neither the leasehold interest nor the franchise interest and ultimately closed the business. Because there is some evidence the Lees suffered damages from Serena's actions which the trial court found constituted fraud, the evidence supporting the damages award is not legally insufficient. *See generally Quigley v. Bennett,* 227 S.W.3d 51, 54 (Tex.2007). However, because the Lees failed to prove the value of that which they actually received, the award of $205,000 in damages is factually insufficient. We sustain issue five in part and overrule issue five in part.

In their third issue the Wangs contend that the evidence supporting the judgment in favor of Eric Lee is legally insufficient. The Wangs argue there is no evidence that Serena made a misrepresentation to Eric or that Eric suffered any damage as a result of any misrepresentation by Serena.

█ It appears that Eric's participation in the family business began in 2002 and that the misrepresentations made prior to that date were made to his parents, not to Eric. In 2004, however, Serena was working directly with Eric on the supposed transfer of the business and made a number of false representation directly to him. The Lees jointly recovered judgment for $205,000; there are no separate damage findings that relate solely to Eric. Finding of fact number six states that "Plaintiffs paid to Defendant Serena Wang $200,000 for purchase of two 'Baskin–Robbins' stores." The evidence shows this money was paid by Wen–Ning and Pao–Yu, not by Eric. Eric testified that "they" paid $5,000 in rent after the stores closed. Eric had taken over operation of the Conroe store but it is unclear whether Eric paid the rent or his parents' paid it directly or out of the receipts from the stores owned by Wen–Ning and Pao–Yu. The agreement between the Lees and the Wangs contemplated that Eric would obtain the franchises in his name, and Eric testified that he lost his opportunity to become a new franchisee and that the stores closures ruined his career plan. Furthermore, Pao–Yu testified that at some point while they were still running the business, Eric became a shareholder of Ice Cream King. Although there is no evidence that Eric sustained damages in the amount of $205,000, there is some evidence that Eric sustained some damage as a result of fraud by Serena. *See Quigley,* 227 S.W.3d at 54. We sustain issue three in part and overrule issue three in part.

We reverse the judgment of the trial court. We render judgment that Wen–Ning Lee, Pao–Yu Lin, and Eric C. Lee take nothing from Alex Wang. The fraud claims of Wen–Ning Lee, Pao–Yu Lin, and Eric C. Lee against Serena Wang are remanded to the trial court for a new trial.

REVERSED; RENDERED IN PART; AND REMANDED.