In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-07-370 CV


____________________



ALEX WANG and SERENA WANG, Appellants



V.



WEN-NING LEE, PAO-YU LIN and ERIC C. LEE, Appellees






On Appeal from the 221st District Court 


Montgomery County, Texas


Trial Cause No. 04-11-09712-CV






OPINION


 Wen-Ning Lee, Pao-Yu Lin, and Eric C. Lee recovered judgment for $205,000 against
Alex Wang and Serena Wang for fraud committed in the course of the sale of a business. 
The Wangs challenge the legal and factual sufficiency of the evidence in five issues. We
reverse the judgment, render judgment in part, and remand the case in part.

 Shortly after emigrating from Taiwan, Wen-Ning Lee and Pao-Yu Lin moved to
Texas to learn the ice cream store business from Serena, who operated six Baskin-Robbins
franchise stores in Texas and three in California. In 1998, the Lees paid the Wangs $60,000
for a one-half interest in a Baskin-Robbins store located in Spring. Wen-Ning worked at the
Conroe Baskin-Robbins and Pao-Yu worked at the Spring Baskin-Robbins. In 1999, the
Lees paid the Wangs $40,000 for a one-half interest in the Conroe Baskin-Robbins store. (1)
Serena provided the documents they signed. Although they had purchased a one-half interest
in the stores, the Lees' sole compensation was equal to or less than the $6.00 hourly wage
paid to the other workers. When the Lees asked for a raise, Serena told them they would
need to purchase the other one-half interest in the two stores. In May 2000, the Lees
purchased one-half of the shares of a newly-formed corporation, Ice Cream King, Inc., from
the Wangs for an additional $100,000. 

 According to Serena, the Lees purchased "100 percent, both two stores, the fixtures,
equipment, good will and the business." Pao-Yu testified that at that time she believed she
already owned one-half of the franchise. The business operation being run at each of the
locations was a Baskin-Robbins ice cream store and the Lees believed Ice Cream King was
the Baskin-Robbins business operating out of the Spring and Conroe locations. Serena
testified that they formed the corporation because the Lees wanted to obtain a Baskin-Robbins Franchise. (2) Serena never told them they were not working as a Baskin-Robbins and
could not represent themselves "as a Baskin-Robbins person." Asked what Pao-Yu
understood her relationship with Baskin-Robbins to be after June 2000, Pao-Yu testified that
she believed she and Wen-Ning owned "100 percent of these two stores." Serena agreed that
"[t]he Lee's family bought both stores, Conroe store and Spring store. 100 percent own
stores, yes." The Lees paid the rent directly to the landlord but Serena did not transfer the
leases to the Lees as she had agreed to do. The Lees operated the two stores and each month
filed the sales tax returns and paid sales tax on the store's receipts. The Lees used a
password Serena gave them to buy their supplies from Baskin-Robbins. 

 Serena Wang held the franchises for the two stores in her name as an individual and
her franchise agreement with Baskin-Robbins prohibited her from transferring the franchise
to a third party. (3) The Wangs did not disclose to the Lees that Serena's contracts with Baskin-Robbins did not permit her to sell her right to operate a Baskin-Robbins franchise to a third
party. (4) Serena continued to hold the franchises while the Lees' son Eric completed his
college education. Serena was supposed to transfer the franchises into Eric's name when
Eric was ready. Meanwhile, Serena told the Lees that a "secret shopper" for Baskin-Robbins
had caught Pao-Yu pocketing proceeds from a sale and placed the store on "probation." (5) 
Serena told the Lees that if they asked Baskin-Robbins to show them the document that
supposedly showed they had been cheating, Baskin-Robbins would close the store down. 
Serena told the Lees that they would have to pay her one-half of the Spring store's profits as
a management fee while the store was on "probation." The Lees continued to operate the
Conroe and Spring stores, but paid Serena one-half of the profit from the Spring store. Over
a three-year period, the Lees paid Serena an additional $79,000. 

 In 2002, the Wangs told the Lees that they were not supposed to show Baskin-Robbins
any of their previous transactions. Eric graduated from college in 2004 and arranged with
Baskin-Robbins to enter into a trainee program. Serena transferred some cash to Eric and
they fabricated some documents to make it appear that Eric had just purchased the Conroe
store, although his parents had actually paid for both of the stores several years earlier.
Serena told Eric that the Spring store could not be transferred to Eric because it was on the
"probation list of Baskin-Robbins." In order to enter the trainee program, Eric had to
produce a written assignment of the lease to the Conroe store and Serena's approval.
Although the Lees had paid the Wangs in full for the stores, Serena still held the leases. The
assignment was presented to Serena, who refused to sign the document. Serena demanded
one-half ownership of the Spring store, but the Lees refused. The landlord would not execute
the assignment unless Serena signed it. Unable to produce an assignment of the lease, Eric
could not enter the Baskin-Robbins franchisees' training program. The Lees had always
ordered their supplies through Serena, who still held the franchises. Serena cut off the Lees'
supplies and contacted Baskin-Robbins to terminate their orders and revoke her permission
to supply the Lees with Baskin-Robbins' products, and the stores closed. Asked why she
refused to assign the leases when the assignment was the only impediment to the Lees'
acquisition of the franchises, Serena replied that she did not cooperate because she had been
served with the Lees' lawsuit. 

 Serena testified that in the 1998 Spring store transaction the Lees bought "50 percent
of the store equipment, fixture, good will, the business for the whole business." By 2000,
the Lees had purchased "100 percent, both two stores, the fixtures, equipment, good will and
the business." But, Serena testified, she did not sell the franchise because she could not.
Serena testified that the Lees were aware that they must obtain permission from Baskin-Robbins in order for her to transfer the franchise in early 2000, as follows: 

 The very beginning even the company formed and the CPA do the
document for Ice Cream King Company, they mentioned about do you know
you did not buy franchisee, you buy the stores only. They say, yeah, yeah, I
know, because Serena said she will help cooperate with us to apply the
franchise. 


Pao-Yu's account of their discussion varied from Serena's. According to Pao-Yu, Wen-Ning's sister noticed the franchises were not mentioned, and Pao-Yu asked Serena about it.
Serena said "there's no problem. Any of the members of your family, as long as this person
is eligible or capable of obtaining the franchise, and she would just go ahead and transfer
either one or both of the stores franchisee to us[.]" 

 The appellants' first two issues challenge the legal sufficiency of the evidence
supporting the judgment entered against Alex Wang and the legal sufficiency of the evidence
supporting the findings of fact as they relate to Alex Wang. The appellees concede error. 
We sustain issues one and two.

 In their fourth issue, the Wangs challenge the legal and factual sufficiency of the
evidence supporting the judgment and findings against Serena. Fraud requires proof of: (1)
a material misrepresentation; (2) that was false; (3) made by the speaker as a positive
assertion, with knowledge that it was false or recklessly without any knowledge of the truth;
(4) made by the speaker with the intent that the other party act upon it; (5) the party acted in
reliance on the representation; and (6) the party thereby suffered injury. See Formosa
Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998). 
A material omission of fact may give rise to fraud liability under circumstances where there
is a duty to disclose. See Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 674 (Tex. 1998). In
Spoljaric v. Percival Tours, Inc., the court stated:

 A promise to do an act in the future is actionable fraud when made with
the intention, design and purpose of deceiving, and with no intention of
performing the act. While a party's intent is determined at the time the party
made the representation, it may be inferred from the party's subsequent acts
after the representation is made. Intent is a fact question uniquely within the
realm of the trier of fact because it so depends upon the credibility of the
witnesses and the weight to be given to their testimony.


708 S.W.2d 432, 434 (Tex. 1986) (citations omitted). Although failure to perform, standing
alone, is no evidence of the intent not to perform when the promise was made, that fact is a
circumstance to be considered with other facts to establish intent. Id. at 435. 

 The Wangs argue there is no evidence or insufficient evidence that Serena did not
intend to transfer the franchises at the time she made the promise to do so. The denial that
a promise was ever made is a factor showing no intent to perform when the promise was
made. Spoljaric, 708 S.W.2d at 435. Serena repeatedly testified that by paying $200,000 to
her the Lees purchased the entire business but that the purchase did not include her rights in
the franchises or the leases. Serena also testified that she had held the franchise for the
Spring store since 1985 and that in 1999 she bought the Conroe store because it was in her
territory. Thus, the Lees could not obtain the franchise simply by applying to Baskin-Robbins because Serena held the rights to the franchise and by her testimony did not sell
those rights to the Lees when they bought the stores. The Lees supposedly bought a one-half
interest in the Conroe store at its initial acquisition by Serena, but she obtained the franchise
in her name alone. 

 The documents through which the parties memorialized their agreement draw no such
distinction between the businesses being run on the premises and the leases and franchise
agreements through which the businesses were operated. When the Lees purchased the one-half interest in the Spring store, Serena as seller and Wen-Ning as buyer executed a document
titled "Covenant Not To Compete And Indemnity And Hold Harmless Agreement." The
contract recites the parties have entered into "a contractual agreement for the sale and
transfer [of] fifty percent (50%) of the business known as BASKIN-ROBBINS, [located in
Spring, TX]." In addition to the $60,000 cash paid to Serena that day, Wen-Ning also issued
a check payable to Baskin-Robbins for "inventory." When the Lees purchased the one-half
interest in the Conroe store, Serena and Wen-Ning executed a document titled "Purchase and
Sale Agreement." This document stated, in part, that Serena agreed to sell "half (½) of the
seller's assets and business represented by Baskin Robbins franchise store #983 located in
Conroe, TX including all equipment, fixtures, goodwill, trademarks, trade names, and other
intangible assets." In addition to the purchase price for "the assets" the contract gave Wen-Ning the right to purchase one-half of the existing inventory from Serena. The parties stated
they "recognize that store #983 is in need of certain updating and refurbishing of its facilities
to comply with new operating agreements, guidelines, and directives established by Baskin
Robbins." Wen-Ning agreed to have "50% responsibility for fifteen thousand dollars." A
stated condition precedent to closing was "Purchaser shall have entered into a landlord
leasing agreement acceptable to Baskin Robbins. Purchaser will pay 50% of the transfer fee
of five thousand ($5,000.00) at the closing title transfer." The "Sale and Purchase
Agreement of Stock" stated that Serena and Alex were selling "all of Sellers' ownership
interest in a certain business . . . known as 'ICE CREAM KING, INC.[,]'" that the business
was being conducted at the Baskin-Robbins locations in Spring and Conroe, that "[t]he total
ownership of the business is divided equally between" the sellers and the buyer, and that the
total purchase price of the stock was $100,000 for "the full payment from buyer for the
purchase of Sellers' ownership interest in the Business." Among the liabilities passed from
seller to buyer in the agreement were "property leases." The agreement also provided for
liability for sales taxes. A receipt stated Serena had received $100,000 for "50% of their
ownership of Ice Cream King" plus additional sums for the inventory of the two stores and
"Entitlement Fee for an additional 5-year Franchise Operation Authorization from Baskin-Robbins Company for the Conroe Store . . . ." Thus, Serena made representations that would
lead a reasonable person to believe that they were buying a franchised business, then denied
that she sold either the franchises or the leases to them. Serena made additional demands
when the Lees demanded performance, then refused to execute the lease assignment although
she admitted that was what she was supposed to do. Serena's admission that she did not
assign the leases because the Lees had filed suit explains much of Serena's behavior overall. 
The Wangs represented that they were selling the business, including elements that were part
of the franchises, such as goodwill, furniture, access to Baskin-Robbins's inventory, and
elements that are incidents of the leasehold estate, such as possession of the property. They
did not really transfer these items to the Lees and Serena knew it at the time. Serena's
subsequent behavior shows that she intended to retain the franchises' benefits for herself. 

 The Wangs argue that Wen-Ning and Pao-Yu admitted at trial that Serena was being
truthful of her intent when she made the representations. The testimony relied upon in the
appellants' brief does not establish a judicial admission. Wen-Ning stated in deposition that
he did not know what Serena's intent was. Read in context, Pao-Yu was merely expressing
her belief regarding Serena and trust in Serena at the time of the transaction and was not
admitting that Serena herself possessed no intent to defraud the Lees. We hold that the
evidence is legally and factually sufficient to support the trial court's finding that Serena
possessed fraudulent intent at the time the promise was made.

 The Wangs also argue that Wen-Ning failed to establish detrimental reliance. 
Detrimental reliance on the part of Wen-Ning was supplied through his wife's testimony. 
Although Wen-Ning stated in his deposition that he never paid attention to the Baskin-Robbins franchise and never thought of the question, there is also evidence that both Wen-Ning and Pao-Yu believed they were purchasing the entire business comprised of the Spring
and Conroe Baskin-Robbins stores. The evidence is legally and factually sufficient to
support the trial court's finding of detrimental reliance by Wen-Ning. We overrule issue
four. 

 Issue five contends the evidence is legally and factually insufficient to support the trial
court's finding that the Lees sustained damages in the amount of $205,000. "Texas
recognizes two measures of direct damages for common-law fraud: the out-of-pocket
measure and the benefit-of-the-bargain measure." Formosa Plastics, 960 S.W.2d at 49. 
"The out-of-pocket measure computes the difference between the value paid and the value
received, while the benefit-of-the-bargain measure computes the difference between the
value as represented and the value received." Id. 

 First, the Wangs argue that the Lees failed to allege an out-of-pocket measure of
damages. The petition alleged "Plaintiffs have suffered damages in the form of out-of-pocket expenses in order to correct the wrongs committed by Defendants, including costs of
court, attorney's fees, litigation expenses and other consequential damages." The Wangs
argue that the "out-of-pocket" damages referred to in this paragraph are limited to court
costs, attorney's fees, and litigation expenses. They provide no authority supporting their
position that the word "including" indicates an exclusive list. The word "including" suggests
an illustrative list rather than an exclusive one. See, e.g., Tex. Gov't Code Ann. §
311.005(13) (Vernon 2005) ("'Includes' and 'including' are terms of enlargement and not
of limitation or exclusive enumeration, and use of the terms does not create a presumption
that components not expressed are excluded."). The request for "out-of-pocket damages"
must be given the broadest reasonable construction. See Anderson v. McRae, 495 S.W.2d
351, 358 (Tex. Civ. App.--Texarkana 1973, no writ) ("Pleadings are to be liberally construed
in favor of plaintiff and to support the judgment when there are no special exceptions."). We
hold that the Lees did not confine themselves to a benefit-of-the-bargain measure of
damages.

 The Lees paid the Wangs a total of $200,000 for the two stores and Eric testified that
they paid $5,000 in rent after the stores closed. There is no evidence of the value of the
freezers they received and no evidence of the profit the Lees earned from the stores during
the years they operated the businesses. The Lees do not argue that they established a benefit-of-the-bargain measure of damages but they do contend in the evidence that they paid the
Wangs $200,000 plus an "unsubstantiated franchisor penalty" and that this therefore,
establishes their "out-of pocket" damages. (6) The out-of-pocket measure of damages is
restitutionary and requires the fact-finder to measure the value of that parted with against the
value of that which is actually received. See Formosa Plastics, 960 S.W.2d at 49. The
evidence is undisputed that the Lees obtained something of value--refrigerators--but no
evidence of the value of what they received. On the other hand, the Lees proved they paid
$200,000 for franchise stores but they received neither the leasehold interest nor the franchise
interest and ultimately closed the business. Because there is some evidence the Lees suffered
damages from Serena's actions which the trial court found constituted fraud, the evidence
supporting the damages award is not legally insufficient. See generally Quigley v. Bennett,
227 S.W.3d 51, 54 (Tex. 2007). However, because the Lees failed to prove the value of that
which they actually received, the award of $205,000 in damages is factually insufficient. We
sustain issue five in part and overrule issue five in part. 

 In their third issue the Wangs contend that the evidence supporting the judgment in
favor of Eric Lee is legally insufficient. The Wangs argue there is no evidence that Serena
made a misrepresentation to Eric or that Eric suffered any damage as a result of any
misrepresentation by Serena. 

 It appears that Eric's participation in the family business began in 2002 and that the
misrepresentations made prior to that date were made to his parents, not to Eric. In 2004,
however, Serena was working directly with Eric on the supposed transfer of the business and
made a number of false representation directly to him. The Lees jointly recovered judgment
for $205,000; there are no separate damage findings that relate solely to Eric. Finding of fact
number six states that "Plaintiffs paid to Defendant Serena Wang $200,000 for purchase of
two 'Baskin-Robbins' stores." The evidence shows this money was paid by Wen-Ning and
Pao-Yu, not by Eric. Eric testified that "they" paid $5,000 in rent after the stores closed. 
Eric had taken over operation of the Conroe store but it is unclear whether Eric paid the rent
or his parents' paid it directly or out of the receipts from the stores owned by Wen-Ning and
Pao-Yu. The agreement between the Lees and the Wangs contemplated that Eric would
obtain the franchises in his name, and Eric testified that he lost his opportunity to become a
new franchisee and that the stores closures ruined his career plan. Furthermore, Pao-Yu
testified that at some point while they were still running the business, Eric became a
shareholder of Ice Cream King. Although there is no evidence that Eric sustained damages
in the amount of $205,000, there is some evidence that Eric sustained some damage as a
result of fraud by Serena. See Quigley, 227 S.W.3d at 54. We sustain issue three in part and
overrule issue three in part. 

 We reverse the judgment of the trial court. We render judgment that Wen-Ning Lee,
Pao-Yu Lin, and Eric C. Lee take nothing from Alex Wang. The fraud claims of Wen-Ning
Lee, Pao-Yu Lin, and Eric C. Lee against Serena Wang are remanded to the trial court for
a new trial.

 REVERSED; RENDERED IN PART; AND REMANDED.


 __________________________________

 CHARLES KREGER

 Justice


Submitted on February 20, 2008

Opinion Delivered June 12, 2008


Before Gaultney, Kreger, and Horton, JJ.
1. Serena testified that she bought the Conroe franchise after the Lees purchased the
Spring store, as follows: 


 The company told me that the store was bad in management and the store for
sale. It's your territory. Would you like to buy? And at that time because the
Lees already partner with us so I asked them--I offered you, would you like to. 
And then sooner or later to get your franchise then you can get a store because
Conroe store a little bit far for me. 
2. In response to a question asking the purpose of forming Ice Cream King, Serena
replied:


 That's from the idea, from Baskin-Robbins district manager. His name
is Ting Hung (spelled phonetically.) Because I told him they are my husband's
friends' relative. They are really liking to own Baskin-Robbins but now they
needed time to get a franchise, not a sole. Apply Baskin-Robbins franchise
from the start of beginning to intervene until you got a license, either three or
four months at the least. So he told me, you can form a company. Your name
in the company will be okay. Put them together. Then one day they got the
franchisee license there will be no problem. 
3. Serena testified the franchise fee was $1,500 per year. According to Serena, the
$200,000 fee did not include the Baskin-Robbins signage but did include Baskin-Robbins's
furniture. She did not get permission from Baskin-Robbins to sell the furniture to the Lees. 
 
4. Serena provided controverting testimony, as follows: "I told them, but, you don't
know all the detail how to run a business. How about we start fifty-fifty, follow me how to
management, how to do the stores, then during the time you can start to apply the franchise." 
5. Serena testified that: 


 Baskin-Robbins has a secret shopper system. Every store need to pay
39.95 for -- per visit. . . . And the very beginning in 2000 -- 2001 I heard some
of the store got caught and shut down. 


 . . . .


 . . . It happened. So, after I got the actual message, is almost at the end
of 2001. And the district manager told us be watch out, it's very strict, so
everybody be more careful. Do your right real report. That very beginning I
heard what is the mystery shopper did. 


Serena claimed that the mystery shoppers visited all six of her stores, and she was warned
by a company supervisor "seems like they caught some problem." The following week, she
claimed, she received a certified letter that all six of her stores would be audited. When she
asked why, someone told her the yields were a lot lower in the Spring and Conroe stores. 
6. The appellees do not provide a record reference for the evidence of an
"unsubstantiated franchisor penalty." They may be referring to the $5,000 transfer fee
mentioned in the 1999 agreement to purchase the Conroe Baskin-Robbins store.